**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SODEXO, INC., AND SODEXO OPERATIONS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Civil Action No.: 8:24-CV-00978 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| AGRI STATS, INC.; CLEMENS FOOD GROUP, LLC; CLEMENS FAMILY CORPORATION; HORMEL FOODS CORPORATION; HORMEL FOODS, LLC; SEABOARD CORPORATION; SEABOARD FOODS, LLC; TRIUMPH FOODS, LLC; TYSON FOODS, INC.; TYSON PREPARED FOODS, INC.; AND TYSON FRESH MEATS, INC., | ) ) ) ) ) ) ) ) ) | **COMPLAINT** **Jury Trial Demanded** |
| | ) | |
| | ) | |
| Defendants. | ) | |

<u>**PLAINTIFFS SODEXO, INC. AND SODEXO OPERATIONS, LLC'S**
**COMPLAINT**</u>

# TABLE OF CONTENTS

**Page**

I.     Introduction ........................................................................................................ 1

II.    Nature of Action ................................................................................................ 1

III.   Jurisdiction and Venue ...................................................................................... 6

IV.   Parties ................................................................................................................ 7

     A.     Plaintiffs Sodexo, Inc., and Sodexo Operations, LLC ............................ 7

     B.     Defendants ............................................................................................... 8

           1.     Agri Stats ...................................................................................... 8

           2.     Clemens ........................................................................................ 9

           3.     Hormel ........................................................................................ 10

           4.     Seaboard ..................................................................................... 11

           5.     Triumph ...................................................................................... 11

           6.     Tyson .......................................................................................... 12

V.     Co-Conspirators ............................................................................................... 13

VI.   Trade and Commerce ....................................................................................... 16

VII.  The importance of Agri Stats to the unlawful conspiracy alleged in this Complaint.
     .......................................................................................................................... 16

     A.     Agri Stats markets its collusive scheme to Pork Producers. ................ 17

     B.     Agri Stats knowingly provided Packer/Processor Defendants and Co-Conspirators with the ability to monitor and enforce their collective restriction of the pork supply and to discipline other conspirators who were not complying with the conspiracy. ...................................................... 20

VIII. The market for the production and supply of pork was conducive to collusion. .............. 31

     A.     Pork is a commodity product with inelastic demand. ........................... 31

     B.     The Packer/Processor Defendants and Co-Conspirators controlled the supply of pork in the United States, which allowed the conspiracy to succeed. .................................................................................................. 33

     C.     The market for the production and sale of pork was concentrated. ....... 40

     D.     There were barriers to entry in the market for packing and processing. ............... 45

IX.   Select trade associations facilitated collusion. ................................................. 46

X.     Defendants and Co-Conspirators implemented collusive, anticompetitive capacity and processing restrictions. ............................................................................... 53

     A.     Overview of the restriction of the pork supply during the conspiracy. ................ 53

1.    Tyson ........................................................................................... 58

2.    Hormel ........................................................................................ 58

3.    Seaboard ..................................................................................... 58

4.    Triumph ....................................................................................... 59

5.    Clemens ....................................................................................... 60

6.    Co-Conspirator Smithfield ........................................................ 60

7.    Co-Conspirator JBS ................................................................... 61

8.    Co-Conspirator Indiana Packers .............................................. 62

B.    Timeline of the Conspiracy ............................................................... 62

XI.    Abnormal pricing during the conspiracy demonstrates the success of the conspiracy. ........................................................................................................ 76

A.    The average hog wholesale price experienced an unprecedented increase beginning in 2009. ............................................................................... 77

B.    The pork cut-out composite price experienced a dramatic increase in 2009 and continuing throughout the Conspiracy Period ................................... 77

C.    The Packer/Processor Defendants and Co-Conspirators' revenues increased beginning in 2009, even taking into account their specific costs. ......................................................................................................... 78

XII.    The Conspiracy was effective in increasing the price of pork sold to Plaintiffs and others in the United States. ....................................................................... 79

XIII.    Plaintiffs' claims are timely ......................................................................... 83

A.    American Pipe tolling .......................................................................... 83

B.    Fraudulent Concealment ..................................................................... 84

XIV.    Plaintiffs' Claims for Relief and Causes of Action ........................................ 91

XV.    Prayer for Relief ............................................................................................ 98

XVI.    Jury Trial Demanded ..................................................................................... 98

## I.    Introduction

1.      Plaintiffs Sodexo, Inc. and Sodexo Operations, LLC (collectively, "Plaintiffs" or "Sodexo") by and through its undersigned counsel, file this Complaint against Defendants Agri Stats, Inc. ("Agri Stats"), Clemens Food Group, LLC, and Clemens Family Corporation (collectively, "Clemens"), Hormel Corporation and Hormel Foods, LLC (collectively, "Hormel"), Seaboard Corporation and Seaboard Foods, LLC (collectively, "Seaboard"), Triumph Foods, LLC ("Triumph"), Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. (collectively, "Tyson) (collectively, the foregoing Defendants are referred to herein as "Defendants," and the Defendants, other than Agri Stats, are referred to herein as "Packer/Processor Defendants"), along with Co-Conspirators JBS USA Food Company ("JBS"), Smithfield Foods, Inc. ("Smithfield"), Indiana Packers Corporation, Daily's Premium Meats, LLC, and Seaboard Triumph Foods, LLC, and others,[1] for their illegal conspiracy[2] to increase the prices of pork sold in the United States. Plaintiffs seek injunctive relief, treble damages, such other damages to the maximum extent allowed under the antitrust laws of the United States, and attorney's fees, and demand a trial by jury.

## II.    Nature of Action

2.      As more fully alleged below, beginning at least as early as January 2009 and continuing until at least 2018 (the "Conspiracy Period"), and with a lingering effect thereafter, Defendants Agri Stats, Clemens, Hormel, Seaboard, Triumph, and Tyson, along with Co-

---

[1] As used in this Complaint, the term "Co-Conspirator" includes other pork producers and/or packers including, without limitation, JBS, Smithfield, Indiana Packers Corporation, Daily's Premium Meats, LLC, and Seaboard Triumph Foods, LLC, and also includes other firms and individuals, such as AgStar Financial Services, ACA.

[2] The term "conspiracy" is used in this Complaint to encompass all forms of conduct actionable under the cause of action asserted against Defendants.

Conspirators JBS, Smithfield, Indiana Packers Corporation, Daily's Premium Meats, LLC, Seaboard Triumph Foods, LLC, and others, conspired to restrain trade, including to fix, increase, maintain, and/or stabilize the price of pork[3] sold to Plaintiffs and others in the United States.

3.    The Packer/Processor Defendants (and their Co-Conspirators) control and dominate the market for the production and sale of pork products in the U.S., *i.e.*, the "Pork" or "Pork Packing Market." During the Conspiracy Period, their market share of the Pork Market was between 80% and 90%.

4.    In furtherance of their concerted action to restrain trade, the Packer/Processor Defendants exchanged detailed, competitively sensitive, and closely guarded non-public information, such as prices, capacity, production, sales volume, and demand, including through Agri Stats.

5.    Beginning at least as early as January 2008, as Packer/Processor Defendants' profitability deteriorated during a global recession, Co-Conspirator Smithfield initiated efforts among Defendants, including through their mutual trade associations and industry groups, to achieve a coordinated reduction in the domestic supply of pork.

6.    Packer/Processor Defendants also coordinated with companies that provided services to the pork industry, but did not produce or sell pork, such as Agri Stats (a data

---

[3] For the purposes of this Complaint, the term "pork" includes, but is not limited to, a variety of meat products from pigs (also referred to in the industry as porcine or swine) purchased fresh, frozen, processed, rendered or non-rendered, including but not limited to any and all processed pork products, (e.g., smoked ham, sausage, bacon, pepperoni, lunch meats), and other processed products and by-products containing pork. "Pork byproducts" can include, but is not limited to, offal and individual parts or organs from pigs used in pet foods (e.g., livers, kidneys, lungs, hearts, cheeks) and/or rendered products (e.g., meat meals and bone meals). From time to time in this complaint, "pork" and "swine" are used interchangeably, particularly when referring to the pork or swine industry.

benchmarking firm) and AgStar Financial Services, ACA (a financial services company now known as Compeer Financial that specialized in loans to hog producers).

7.     In 2008, the CEO of Co-Conspirator Smithfield publicly announced Smithfield's plan to reduce its sow herd and urged all others in the pork industry to follow Smithfield's lead. To discourage smaller independent hog producers from increasing their own production of hogs, Smithfield encouraged AgStar (a significant lender to hog producers) to pressure independent hog producers to reduce their production of hogs, and AgStar did so.

8.     As detailed in this Complaint, between early 2008 and late 2009, Packer/Processor Defendants met numerous times through trade associations and other industry groups. Those meetings facilitated the initiation and coordination of their unlawful agreement to reduce the supply of pork. The Packer/Processor Defendants publicly attempted to pretextually justify their pork supply reductions as a natural outcome of economic and other conditions facing the industry. However, this was untrue. Packer/Processor Defendants recognized internally that it was in their independent self-interest to produce as much pork as they could when profit margins were positive. Accordingly, supply reductions would not benefit each of them unless those supply reductions were coordinated among all pork processors. The Packer/Processor Defendants' reductions in the supply of pork in the United States were not justified by input costs or other economic factors. Instead, the pork supply reductions were based on an understanding that all major pork processors would implement similar supply reductions, and that those reductions would in turn result in higher pork prices and profit margins. The Packer/Processor Defendants reduced the supply of pork in the United States through a collusive agreement or understanding for their own collective benefit that was reached in secret and concealed from the public.

9.     Defendant Agri Stats began providing highly sensitive "benchmarking" reports to the Packer/Processor Defendants. Legitimate benchmarking allows competitors to compare their profits or performance against that of other unidentified companies. Yet Agri Stats' reports are unlike those of lawful industry reports; rather, Agri Stats gathered detailed competitively-sensitive and closely guarded non-public sales, financial and production data from each of the Packer/Processor Defendants and their Co-Conspirators, standardized this information, and produced customized reports and graphs about Packer/Processor Defendants' pork businesses, including reports about their respective pork prices, production, volume, costs, margin, slaughter information, capacity, sales volume, inventory levels, and plant-specific information about production lines and yields (collectively, "Competitively-Sensitive Information") with the intent to share them with the conspirators. The type of information available in these reports was not the type of information that competitors would provide to each other in a competitive market, free of collusion.

10.    On at least a monthly basis, and often far more frequently (e.g., weekly or every other week), Agri Stats provided the Packer/Processor Defendants with Competitively-Sensitive Information (such as profits, costs, prices, and slaughter information), and regularly provided the keys to deciphering which data belong to which participant. The effect of this information exchange was to allow the pork producers to monitor each other's production, and therefore control supply and price in furtherance of their anticompetitive scheme.

11.    The Competitively-Sensitive Information exchanged through Agri Stats also bears hallmarks of the enforcement and implementation mechanism of a price-fixing scheme. First, information contained in Agri Stats reports was specific to pork producers—including information

on profits, prices, costs, and production levels—instead of being aggregated as industry averages to avoid transactional specificity and the easy identification of specific producers.

12.     Second, none of the Agri Stats information was publicly available. Agri Stats is a subscription service that required the Packer/Processor Defendants and Co-Conspirators to pay millions of dollars over the Conspiracy Period—far in excess of any other pricing and production indices. Agri Stats ensured that its detailed, sensitive business information was available only to the Packer/Processor Defendants and Co-Conspirators and not to other buyers in the market. The Packer/Processor Defendants and Co-Conspirators knew when they provided their respective Competitively-Sensitive Information to Agri Stats that it would be reported to their competitors in the private Agri Stats reports. They also knew at the time that their Competitively-Sensitive Information in the Agri Stats reports was being deciphered by their co-Defendants and Co-Conspirators, so that each of them would learn which Competitively-Sensitive Information belonged to which Packer/Processor Defendant or Co-Conspirator. This enabled the Packer/Processor Defendants and Co-Conspirators to monitor each other's Competitively-Sensitive Information and enforce the conspiracy, and effectively control domestic pork supply and price.

13.     Further, the Packer/Processor Defendants coordinated with industry lenders such as AgStar to pressure all hog farmers to reduce their sow herds and limit importation of pork from other countries, including Canada, by withholding funding for those that did not get on board with the supply reduction conspiracy.

14.     Defendants went to great lengths to keep the existence of the conspiracy a secret. Furthermore, each Defendant engaged in acts in furtherance of the conspiracy by participating in such supply cuts and by limiting increases in supply that would not have otherwise occurred.

15.     In addition, there were numerous "plus factors" in the pork industry during the Conspiracy Period, including, but not limited to, multiple industry characteristics that facilitate collusion, such as vertically integrated operations, high barriers to entry preventing competitors from coming into the market, high pork industry consolidation and concentration, inelastic supply and demand, and homogeneity of pork products (within each cut type).

16.     By late 2009, this plan succeeded, as the pork industry cut its supply of pork by approximately 6.4%, primarily through the liquidation of sow herds (female pigs used for breeding). With this structural reduction in the supply of pork, Defendants were able to monitor their conspiracy through Defendant Agri Stats.

17.     Defendants' purposeful restriction of pork supply had the intended effect of increasing pork prices to Plaintiffs. As a result of Defendants' unlawful conduct, Plaintiffs paid artificially inflated prices for pork during the Conspiracy Period. Such prices exceeded the amount Plaintiffs would have paid if the price for pork had been determined by a competitive market. Thus, Plaintiffs were injured in their businesses or property by Defendants' unlawful conduct.

18.     Plaintiffs allege that Defendants and their Co-Conspirators' combination, coordination, or conspiracy in restraint of trade is a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I), and a violation of the Packers & Stockyard Act, 7 U.S.C. §§ 181–229 (Count II).

### III.     Jurisdiction and Venue

19.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. 9.

20.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

21.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

22.     This Court has personal jurisdiction over each Defendant because each Defendant – throughout the U.S. and including in this District and the state of Maryland – has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District and the state of Maryland.

**IV.     Parties**

**A.  Plaintiffs Sodexo, Inc., and Sodexo Operations, LLC**

23.     Plaintiff Sodexo, Inc. is an Illinois corporation with its headquarters in Gaithersburg, Maryland.

24.     Plaintiff Sodexo Operations, LLC, is a limited liability corporation organized under the laws of the state of Delaware with its headquarters in Gaithersburg, Maryland.

25.     Plaintiffs also utilized distributors to supply Plaintiffs' customers with pork and pork products, which were purchased on behalf of Plaintiffs pursuant to contractual supply agreements between Plaintiffs and suppliers, and distribution agreements between Plaintiffs and the distributors. These distributors include, among others, Sysco Corporation, Suisan Company, Ltd., Performance Food Group, Inc., Gordon Food Service Group, Inc., Ben E. Keith Company,

7

Gold Star Distribution, Inc., and their respective subsidiaries, affiliates, divisions, predecessors and assigns (which are collectively referred to herein as "Assignors"). The Assignors, as purchasing agents for Plaintiffs, have conveyed, assigned, and transferred all rights, title, and interest in and to all claims and causes of action arising out of or relating to the Assignors' purchase of pork or pork products on behalf of Plaintiffs from any supplier that the Assignors subsequently sold to Plaintiffs during the Conspiracy Period. Plaintiffs therefore bring this action on their own behalf, and pursuant to assignments with Assignors that made direct purchases on behalf of Plaintiffs.

26.     During the relevant time period, Plaintiffs and their Assignors purchased pork at artificially inflated prices directly from one or more of the Defendants, and/or their affiliates or agents, and suffered injury to their business or property as a direct or proximate result of all Defendants' wrongful conduct.

### B. Defendants

#### 1. Agri Stats

27.     Agri Stats, Inc. is an Indiana corporation located in Fort Wayne, Indiana. Until about 2018, Agri Stats was a subsidiary of Eli Lilly & Co. Agri Stats is now a wholly-owned subsidiary of Agri Stats Omega Holding Co. LP, a limited partnership based in Indiana. Agri Stats is a co-conspirator of the Packer/Processor Defendants and during the Conspiracy Period has knowingly played an important and active role by participating in and facilitating the Packer/Processor Defendants' collusive scheme detailed in this Complaint. Agri Stats has a unique and deep relationship with the pork industry generally, and specifically with each of the Defendants identified below, all of which were Agri Stats' primary customers, at least during the Conspiracy Period. Defendants Clemens, Hormel, Seaboard, Triumph, and Tyson, and Co-Conspirators JBS, Smithfield, and Indiana Packers, were all Agri Stats subscribers and reported a

8

wide variety of Competitively-Sensitive Information to Agri Stats, which, according to a 2016 Eli Lilly earnings call, was used by "over 90% of the poultry and pig market" in the United States.

28.     All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers, or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the U.S., including in this District.

### 2. Clemens

29.     Clemens Food Group, LLC is a limited-liability company with its principal place of business in Hatfield, Pennsylvania. During the Conspiracy Period, Clemens Food Group, LLC or its predecessors, wholly owned or controlled subsidiaries or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including this District.

30.     The Clemens Family Corporation is a Pennsylvania corporation with its principal place of business in Hatfield, Pennsylvania. The Clemens Family Corporation is the parent company of Clemens Food Group, LLC. During the Conspiracy Period, The Clemens Family Corporation, or its predecessors, wholly owned or controlled subsidiaries or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

31.     As noted above, Clemens Food Group, LLC and Clemens Family Corporation are collectively referred to herein as "Clemens."

32.     During the Conspiracy Period, Clemens reported Competitively-Sensitive Information to Agri Stats and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

### 3.  Hormel

33.     Hormel Foods Corporation is a Delaware corporation with its principal place of business in Austin, Minnesota. During the Conspiracy Period, Hormel Foods Corporation, or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

34.     Hormel Foods, LLC is a Minnesota corporation with its principal place of business in Austin, Minnesota. Hormel Foods, LLC is a wholly owned subsidiary of Defendant Hormel Foods Corporation. During the Conspiracy Period, Hormel Foods Corporation or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

35.     As noted above, Hormel Foods Corporation and Hormel Foods, LLC are collectively referred to herein as "Hormel."

36.     During the Conspiracy Period, Hormel reported Competitively-Sensitive Information to Agri Stats and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

#### 4. Seaboard

37. Seaboard Foods, LLC is a limited-liability company with its principal place of business in Shawnee Mission, Kansas and is a wholly owned subsidiary of Seaboard Corporation. During the Conspiracy Period, Seaboard Foods, LLC or its predecessors, wholly owned or controlled subsidiaries, including without limitation, Daily Foods, Inc., John R. Daily, Inc., and any other subsidiary doing business as Daily's Premium Meats and/or Daily's (hereinafter "Daily's") through July 10, 2014, as well as Seaboard's jointly owned or controlled subsidiaries together with Triumph Foods after July 2014 including without limitation, Daily's, and after May 2015, Seaboard Triumph Foods, LLC (altogether, collectively referred herein to as "Seaboard") participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District; and engaged in the unlawful conduct alleged in this, which proximately caused injury and damage to Plaintiffs.

#### 5. Triumph

38. Triumph Foods, LLC ("Triumph") is a limited-liability company with its principal place of business in St. Joseph, Missouri. During the Conspiracy Period, Triumph reported Competitively-Sensitive Information to Agri Stats and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs. During the Conspiracy Period, Triumph or its predecessors, wholly owned or controlled subsidiaries, or jointly owned subsidiaries together with Seaboard, including but not limited to, Daily's Premium Meats and Seaboard Triumph Foods or affiliates, participated in the conspiracy alleged in this Complaint and directly or through Seaboard or affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

11

### 6. Tyson

39.     Tyson Foods, Inc. is a publicly-traded Delaware corporation with its principal place of business in Springdale, Arkansas. During the Conspiracy Period, Tyson Foods, Inc. or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including the District.

40.     Tyson Prepared Foods, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas. Tyson Prepared Foods, Inc. is a wholly owned subsidiary of Tyson Foods, Inc. During the Conspiracy Period, Tyson Prepared Foods, Inc. or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

41.     Tyson Fresh Meats, Inc. is a Delaware corporation with its principal place of business in Springdale, Arkansas. Tyson Fresh Meats, Inc. is a wholly owned subsidiary of Tyson Foods, Inc. During the Conspiracy Period, Tyson Fresh Meats, Inc. or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

42.     As noted above, Tyson Foods, Inc., Tyson Prepared Foods, Inc., and Tyson Fresh Meats, Inc. are collectively referred to herein as "Tyson."

43.     During the Conspiracy Period, Tyson reported Competitively-Sensitive Information to Agri Stats and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs.

44.     Tyson, after being served with a grand jury subpoena in April 2019 in connection with the Department of Justice ("DOJ") investigation of the broiler chicken industry, applied for leniency from prosecution under the DOJ's Corporate Leniency Program, pursuant to which Tyson admitted to having participated in activity constituting a criminal antitrust violation, and agreed to fully cooperate with the DOJ, to avoid criminal prosecution and fines.

## V.     Co-Conspirators

45.     Co-Conspirator JBS USA Food Company ("JBS") is a Delaware corporation, headquartered in Greeley, Colorado. JBS is one of the world's largest beef and pork processing companies and a wholly owned subsidiary of JBS USA Food Company Holdings, Inc., which holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world.

46.     On February 23, 2021, Pilgrim's Pride Corporation pled guilty to charges brought by the DOJ for "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act," from "at least as early as 2012 and continuing through at least 2017," and agreed to pay a criminal fine of approximately $107 million.

47.     During the Conspiracy Period, JBS reported Competitively-Sensitive Information to Agri Stats and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiffs. During the Conspiracy Period, JBS or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

48.     Co-Conspirator Smithfield Foods, Inc. ("Smithfield") is a Commonwealth of Virginia corporation with its principal place of business in Smithfield, Virginia. Smithfield is a

13

subsidiary of WH Group Limited, a Chinese company. During the Conspiracy Period, Smithfield reported Competitively-Sensitive Information to Agri Stats and engaged in the unlawful conduct alleged in this Complaint, which proximately caused injury and damage to Plaintiff. During the Conspiracy Period, Smithfield or its predecessors, wholly owned or controlled subsidiaries, or affiliates, participated in the conspiracy alleged in this Complaint and directly or through an affiliate Co-Conspirator, sold pork in interstate commerce to Plaintiffs and other purchasers in the United States, including in this District.

49.     Co-Conspirator Indiana Packers Corporation is an Indiana corporation headquartered in Delphi, Indiana, and reports a wide variety of pork data to Agri Stats, including, without limitation, highly-detailed, confidential information regarding its production and sales of pork. During the Conspiracy Period, Indiana Packers Corporation and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates (hereinafter collectively referred to as "Indiana Packers") sold pork in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States. Indiana Packers Corporation's parent companies are Itoham Foods, Inc., Mitsubishi Corporation, and Mitsubishi Corporation (Americas).

50.     Co-Conspirator Daily's Premium Meats, LLC is a Delaware limited liability company headquartered in Kansas City, Missouri. During the Conspiracy Period, Daily's Premium Meats and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States. During the Conspiracy Period until approximately July 10, 2014, Daily's Premium Meats was wholly owned by Defendant Seaboard.

51.     Beginning on or about September 27, 2014, and continuing through the present, Seaboard and Triumph has each held (directly or indirectly) a 50% interest in Daily's Premium

Meats, which is controlled entirely by Seaboard and Triumph. As of September 27, 2014, Daily's Premium Meats' Board of Directors was made up of four Directors appointed by Seaboard, consisting of Seaboard employees, and four Directors appointed by Triumph, consisting of Triumph employees. Daily's sells premium bacon products supplied through Seaboard Foods' connected food system, including from Seaboard and Triumph processing facilities.

52.     Co-Conspirator Seaboard Triumph Foods, LLC is a Delaware limited liability company headquartered in Sioux City, Iowa. It is a joint venture between Seaboard Foods and Triumph Foods that, upon information and belief, is owned at least in part by Seaboard Foods and Triumph Foods. During the Conspiracy Period, Seaboard Triumph Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold pork in interstate commerce, directly or through its affiliates, to purchasers in the United States.

53.     Various other persons, firms, and corporations not specifically named as Defendants or Co-Conspirators in this Complaint, including, without limitation, AgStar Financial Services, ACA ("AgStar") (n/k/a Compeer Financial), combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

54.     Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not named as defendants in this Complaint, and whether or not identified herein as a Co-Conspirator.

55.     The individuals employed by Defendant and Co-Conspirators who participated in the conspiracy did so on behalf of, and to the benefit of, their respective employer Defendant or Co-Conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of

15

them during the course and scope of their employment by their Defendant or Co-Conspirator employer.

## VI.     Trade and Commerce

56.     During the Conspiracy Period, Defendants and their Co-Conspirators engaged in business that affected or was within the flow of interstate commerce, and the effect of that business on interstate commerce was substantial. In particular, the activities of Defendants and Co-Conspirators were within the flow of interstate and foreign commerce or had a substantial effect upon interstate or foreign commerce in that: (a) Defendants and their Co-Conspirators sold and shipped substantial quantities of pork in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their Co-Conspirators produced the pork; (b) data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States; and/or (c) money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States.

57.     The effect of Defendants and/or their Co-Conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## VII.    The importance of Agri Stats to the unlawful conspiracy alleged in this Complaint.

58.     Agri Stats had an important role in the conspiracy alleged in this Complaint. Agri Stats collected and disseminated the Packer/Processor Defendants and Co-Conspirators' Competitively Sensitive Information, and provided detailed price reports to the Packer/Processor Defendants and Co-Conspirators through its subsidiary, Express Markets, Inc. Agri Stats' role in the conspiracy is further described below.

16

**A.  Agri Stats markets its collusive scheme to Pork Producers.**

59.      The Chicago Mercantile Exchange ("CME"), the U.S. Department of Agriculture ("USDA"), and various other entities publish publicly available aggregated daily, weekly, monthly, and annual supply and pricing information concerning the U.S. pork industry, including: the CME Lean Hog Index, which reflects prices paid for hogs in the U.S.; the CME Pork Cutout Index, which reflects the prices paid for pork (a "cutout" is the approximate value of a hog calculated using the prices paid for wholesale cuts of pork); and the USDA's National Daily Hog and Pork Summary. The pricing and production information in those reports and indices is completely anonymous and aggregated (or averaged), and the USDA reports clearly state that certain prices are "not reported due to confidentiality."

60.      In contrast, Agri Stats generates confidential pork industry data considerably more detailed than any similar types of available reports. Agri Stats describes itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance." But describing Agri Stats as a "benchmarking" service does not accurately reflect its critical role in the pork industry and the fundamental importance Agri Stats had to the Packer/Processor Defendants and Co-Conspirator Indiana Packers. Only Agri Stats received from each Packer/Processor Defendant and Co-Conspirator Indiana Packers, and then provided to all the Packer/Processor Defendants and Co-Conspirator Indiana Packers, sufficiently detailed information to accurately determine producer-specific production, costs, and general efficiency.

61.      Beginning in 2008, after two decades focusing primarily on the poultry industry, Agri Stats began selling its so-called "benchmarking" services to pork processors, including to each of the Defendants. Pork processors were told by Agri Stats' Greg Bilbrey that "benchmarking in the swine industry could range from simple production comparisons to <u>elaborate and</u>

17

sophisticated total production and financial comparisons. Each and every commercial swine operation is encouraged to participate in some benchmarking effort."[4]

62.     Agri Stats emphasized to the Packer/Processor Defendants and Co-Conspirator Indiana Packers that the "ultimate goal" of collectively sharing their Competitively-Sensitive Information was to "[increase] profitability—not always increasing the level of production." Furthermore, Agri Stats told the industry: "Each swine production company should be participating in some type of benchmarking. To gain maximum benefit, production, cost, and financial performance should all be part of the benchmarking program…. Producer groups could design and operate their own benchmarking effort," and, most importantly, "[e]ach participant has to commit" to ensure the accuracy and reliability of the data collected and submitted to Agri Stats.[5]

63.     In April 2009, Agri Stats' Bilbrey again invited pork processors, including Packer/Processor Defendants and Co-Conspirator Indiana Packers, to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. Producer groups could design and operate their own benchmarking effort."[6]

64.     The Packer/Processor Defendants and Co-Conspirator Indiana Packers accepted this invitation and, not later than 2009, they started participating in the detailed benchmarking scheme using Agri Stats and its reports. The Packer/Processor Defendants and Co-Conspirator

---

[4] Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, at 43 (2008) (emphasis added).

[5] *Id.* at 46.

[6] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

Indiana Packers recognized, understood and agreed that the Competitively-Sensitive Information that they received about each other's pork business in the Agri Stats' reports provided them with a means to collectively restrict pork production and monitor and enforce their respective compliance with such collective action for the purpose and with the effect of increasing, fixing, maintaining and/or stabilizing the price of pork sold to Plaintiffs and others.

65.      Each Packer/Processor Defendant and Co-Conspirators JBS, Smithfield, and Indiana Packers, identified specific executives who were responsible for data transmissions to and from Agri Stats relating to pork pricing, supply, slaughter, inventory, export, or production levels.

- <u>Clemens</u>: Joshua Rennels (Treasurer, Clemens Food Group)

- <u>Hormel</u>: Paul Bogle (Director, Cost Accounting)

- <u>Seaboard</u>: Damon Ginther (Senior Director of Business Data & Analytics), Mel Davis (Vice President of Hog Procurement and Bio-Energy), Tom Doyle (Operations Controller)

- <u>Triumph</u>: Matt England (Chief Integrated Business Strategy Officer), Ken Grannas (Director Inventory/Reporting), Tom French (Director, Margin Management), Joe Diebold (Chief Financial Officer), Dan Marlow (Corporate Controller)

- <u>Tyson</u>: Deb McConnell (Division Controller)

- <u>JBS</u>: Gary Albright (Head of Business Analysis), Kevin Arnold (Head of Finance), Jamie Fosbery (Analyst), Raven Goodlow (Business Analyst), Robbie Kearns (Business Analyst), Lisa Peters (Business Analyst), Eli Zoske (Cost Accountant)

- <u>Smithfield</u>: Aimee Ward (Director, Hog Finance), Kent Hillbrands (Sr. Director, Operations Finance), Elizabeth Barger (Data Analyst)

- <u>Indiana Packers</u>: Galen Stiverson (Director of Financial Planning Analysis).

**B. Agri Stats knowingly provided Packer/Processor Defendants and Co-Conspirators with the ability to monitor and enforce their collective restriction of the pork supply and to discipline other conspirators who were not complying with the conspiracy.**

66.     Agri Stats was key to the formation, operation, and continuing stability of the conspiracy alleged in this Complaint. Agri Stats provided the Packer/Processor Defendants and Co-Conspirators with the ability to share critical and proprietary information concerning key pork business metrics, including production levels and short and long-term production capacity.

67.     Defendants Clemens, Hormel, JBS, Seaboard, Smithfield, Triumph and Tyson were Agri Stats subscribers and reported their Competitively-Sensitive Information to Agri Stats.

68.     Key Defendants and Co-Conspirators repeatedly encouraged Agri Stats to sign up other Defendants or to expand its collection program, which is a clear indication that they expected to profit from greater participation, and were successful in doing so. In 2016, Agri Stats' then-parent company, Eli Lilly, reportedly stated that "over 90% of the poultry and pig market"[7] uses Agri Stats in the United States.

69.     Therefore, if enough of the Packer/Processor Defendants and Co-Conspirators subscribed to Agri Stats during the conspiracy—which they did—and if enough of them restricted pork supply during that period—which they did—then the conspiracy would be effective in increasing, maintaining, stabilizing and/or fixing the price of pork sold to Plaintiffs and others above a competitive level—which it was.

70.     Unlike traditional "benchmark" services that rely upon unaudited and aggregated publicly available data, Agri Stats reportedly obtained audited data directly from Packer/Processor Defendants and Co-Conspirators during the conspiracy. When a processor joined Agri Stats, the

---

[7] Transcript, Eli Lilly and Co. at Morgan Stanley Global Healthcare Conference (Sept. 13, 2016).

latter's employees spent up to a month at the processor's site to learn, set up, audit, and prepare the processor to submit its data each month. After submission, Agri Stats took raw data and pulled it into input systems in the right format and location each month. This verified data allowed participants to make an "apples to apples" comparisons with competitors in order to increase profitability.

71.     Agri Stats' Bilbrey told the London Swine Conference in March of 2012: "Agri Stats collects participant financial and production data electronically each month. Internal auditors convert the data, prepare it for comparison, and perform the monthly audits. Each company's financial data is reconciled to their general ledger to help ensure actual costs are reported. Raw numbers are used in Agri Stats' standardized calculations, so all company numbers are calculated the same way."

72.     During the conspiracy, Packer/Processor Defendants and Co-Conspirators JBS, Smithfield, and Indiana Packers who subscribed to Agri Stats received monthly detailed reports and graphs that allowed them to compare their performance and costs to other participants, the average of all companies, the top 25 percent, and the top five companies. Current month, previous quarter and previous twelve-month periods were reported. As of 2009, each monthly report contained nine sections for analysis and comparison: (1) Performance Summary, (2) Feed Mill, (3) Ingredient Purchasing, (4) Weaned Pig Production, (5) Nursery, (6) Finishing, (7) Wean-to-Finish, (8) Market Haul, and (9) Profit and Sales.[8] Agri Stats' Bilbrey advised that the Agri Stats reports provided subscribers, including the Packer/Processor Defendants and Co-Conspirators,

---

[8] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

with "monthly detailed reports and performance summaries that allow them to compare their performance to other participants, the average of all companies and the top 25%."[9]

73.     Current and historical information regarding the production numbers of hogs provides forward-looking supply information to competitors. The typical hog production cycle lasts about four years. This is a function of the hog biological cycle, involving time needed for: (1) breeding an existing sow; (2) selecting and retaining piglets; and (3) breeding and rearing the selected piglets. Given the length of time needed to breed an existing sow, choose and retain offspring for breeding, and breed and rear the resulting crop of piglets, it takes a hog producer nearly two years to increase production substantially.

//

//

//

//

//

//

//

//

//

//

//

//

---

[9] Greg Bilbrey, *Benchmarking and Cost – Production Relationships*, 19 Advances in Pork Production Journal, p. 41 (2008).

74.     One presentation from Agri Stats shows the level of detail provided to Defendants regarding profits in the pork market.[10]

**Figure 1**

Top 25% in Profit - Variances to Average Company - 2009-2007

| | Mkt Sales | Mkt %Culls | Fin Cost | Mkt Wt | Mkt Age | Nur/Fin Mort % | FIN FC Cals | FIN Feed $/ton | Wean Pig $ | # Born Live | Pre-Wn Mort % | Pigs/ MSY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | | | | | |
| VAR to AVG | 2.93 | -0.85 | -2.17 | 3.98 | -2.46 | -2.05 | -35.50 | -9.39 | -0.16 | -0.20 | -1.07 | 0.23 |
| avg book | 41.19 | 3.23 | 50.12 | 263 | 187.82 | 9.99 | 3862 | 215.18 | 28.68 | 11.60 | 14.69 | 22.05 |
| % var to Avg | 92.89 | 126.31 | 104.33 | 98.49 | 101.31 | 120.52 | 100.92 | 104.36 | 100.57 | 101.69 | 107.27 | 98.93 |
| variance | 12 | | | 11 | 7 | | | | 9 | 6 | | 10 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 35,001,089 Pigs Finished | | | | | | | | | | | | |
| **2008** | | | | | | | | | | | | |
| VAR to AVG | 1.89 | -1.08 | -3.72 | 8.38 | -6.75 | -2.45 | -20.56 | -23.41 | 0.36 | 0.17 | -2.34 | 1.50 |
| avg book | 47.44 | 3.09 | 55.00 | 261 | 189 | 11.18 | 3908 | 249.69 | 32.52 | 11.33 | 14.24 | 22.72 |
| % var to Avg | 96.01 | 134.94 | 106.76 | 96.79 | 103.57 | 121.92 | 100.53 | 109.38 | 98.88 | 98.46 | 116.46 | 93.42 |
| variance | 11 | | | 10 | 6 | | 7 | | 8 | 9 | | 12 |
| ranking | | 1 | 5 | | | 2 | | 4 | | | 3 | |
| 30,785,319 Pigs finished | | | | | | | | | | | | |
| **2007** | | | | | | | | | | | | |
| VAR to AVG | 1.04 | -0.51 | -1.93 | 5.14 | -2.29 | -2.30 | -75.57 | -0.21 | -1.00 | 0.09 | -0.69 | 1.16 |
| avg book | 46.69 | 2.36 | 44.75 | 260 | 187 | 10.98 | 3913 | 182.98 | 28.16 | 11.12 | 14.05 | 22.40 |
| % var to Avg | 97.78 | 121.43 | 104.31 | 98.02 | 101.22 | 120.96 | 101.93 | 100.11 | 103.56 | 99.21 | 104.90 | 94.82 |
| variance | 11 | | | 10 | 7 | | 6 | 8 | | 9 | | 12 |
| ranking | | 1 | 4 | | | 2 | | | 6 | | 3 | |
| 22,306,500 Pigs finished | | | | | | | | | | | | |

75.     The purpose of the reports was to improve the Packer/Processor Defendants' and Co-Conspirators' profitability by enabling them to restrict output and raise prices. The Agri Stats report referenced above shows the ranking of each company in profitability and compares the company to its competitors by providing the variance from the average. This information underscores that the purpose of these reports was not to allow customers to save money through lower prices and more efficient production. Rather, the opposite was true; the purpose was to increase the Packer/Processor Defendants' and Co-Conspirators' profitability, and the impact was higher prices for pork purchasers like Plaintiffs.

---

[10] Greg Bilbrey, *Key Drivers to Farm Profitability* (2011).

76.     A Special Report from the Banff Pork Seminar 2011 featured another presentation by Bilbrey of Agri Stats and Tom Stein of MetaFarms who "showed producers at the 2011 Banff Pork Seminar that better records mean better financial performance."[11] The report explained that the Agri Stats benchmarking process requires processors to supply all their production records and all financial records so that benchmarking results can be tied back to general ledger cost data. Bilbrey further explained the importance of the Agri Stats reports in increasing profitability: "This past 12 months top producers had about a $20 difference in profit, $11 a head lower cost and about $9 a head advantage in sales, the price they got for their pigs."[12]

77.     Much of the information shared by Agri Stats and the Packer/Processor Defendants and Co-Conspirators was unnecessary to achieve any legitimate benefits for pork purchasers. Exchanging Competitively-Sensitive Information is not required to achieve major efficiencies.[13] In fact, in a truly competitive market, the participants would closely protect their Competitively-Sensitive Information from disclosure, because providing it to competitors would be to their disadvantage—unless, of course, there was an agreement or understanding among them that they would use the information to the joint benefit of each other as occurred in the pork industry.

78.     In the lead up to and then during the conspiracy, Agri Stats knew that it played an important role in the formation, implementation, and enforcement of the conspiracy alleged in this Complaint. Agri Stats repeatedly touted its role in standardizing costs across its subscribers—

---

[11] *Tough Years in Pork Business Show Benefits of Benchmarking, Recordkeeping,* Inside BPS (Jan. 25, 2011), http:www.meristem.com/meetings/bps_2011-inside_bps.htm#15.

[12] *Id.*

[13] *FTC Roundtable on Information Exchanges Between Competitors Under Competition Law* Organization for Economic Cooperation and Development, (Oct. 21, 2010) at 6, https://www ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/1010informationexchanges.pdf.

allowing each of the Packer/Processor Defendants and Co-Conspirators to make an "apples to apples" comparison of its data against its competitors. One presentation from Agri Stats spoke directly to this point, noting to industry participants that they could not undertake such a detailed cost analysis among competitors without Agri Stats auditing and standardizing the data[14]:

**Figure 2**



79.     Agri Stats stated that to ensure data contained in the reports were accurate, the participants had to "agree on calculation and data collection procedures," they must "[d]etermine tolerance and outlier status and enforce," they must "[h]ave an administrator to compile the data and enforce procedures," and most importantly, "[e]ach participant has to commit."[15]

80.     In addition to these reports, "Agri Stats account managers conduct[ed] on-site live reviews to assist with report utilization and analysis."[16] The information provided by Agri Stats was so detailed that clients, including Packer/Processor Defendants and Co-Conspirator Indiana

---

[14]     Greg   Bilbrey,   *Data   Integrity*,   Slideshare   net   (Sept.   21,   2015), https://www.slideshare.net/trufflemedia/greg-bilbrey-data-integrity-using-records-for-benchmarking-and-operations.

[15]     *Id.*

[16]     Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, *from The Pig Site*, https://www.thepigsite.com/articles/benchmarking-and-tools-to-maximise-profit.

Packers, requested the site visits by Agri Stats employees to assist them in understanding the intricacies and implications of the data. Agri Stats' employees each possessed expertise in a specific area of production, and the value added by their insights was as important to the Packer/Processor Defendants and Co-Conspirator Indiana Packers as the data in the reports themselves. The fee for the visits fluctuated based on a number of factors but was substantial.

81.    During the Conspiracy Period, Agri Stats' executives and account managers fanned out across the pork-producing regions of the United States to meet with their clients, including the Packer/Processor Defendants and Co-Conspirator Indiana Packers. Because Agri Stats traveled and was present among them regularly, discussing their respective Competitively-Sensitive Information, Agri Stats was in a unique position to share information among Packer/Processor Defendants and Co-Conspirator Indiana Packers at these regular meetings.

82.    A common saying by Agri Stats was "you cannot produce your way to the top of the page." Rather, Agri Stats has stated that "the ultimate goal is increasing profitability – not simply increasing level of production."[17]

83.    In May 2015, a subsidiary of Agri Stats, Express Markets (EMI), announced that it was adding its market analysis of pork to its product offerings in order to meet the broad information and knowledge needs of its customers. EMI had provided its extensive pricing reports to Broiler producers since 2003.

84.    Among EMI's offered services are "Poultry Market Forecasts," which are not actually limited to the poultry market. As described on its website:

> EMI's economists construct industry forecasts and provide detailed commentaries
> which benefit our clients with market visibility. This forward-looking analysis can

---

[17] Greg Bilbrey, *Benchmarking and Tools to Maximize Profit*, London Swine Conference – Tools of the Trade (April 1-2, 2009).

be utilized for a multitude of pricing and planning purposes. Forecasts include, but are not limited to: production, supply, prices, feed ingredients, industry cost and returns, exports, and international trade. Beef and pork perspectives are presented in relation to their impact on the poultry industry. Monthly webcasts are held to discuss developing issues affecting the market. Talking points include feed ingredients, broiler cost and returns, broiler markets, broiler production, turkey production and price, international trade, and outlooks on beef and pork.

85.     By providing Competitively-Sensitive Information to Packer/Processor Defendants and Co-Conspirators, Agri Stats allowed each member of the conspiracy to monitor each other's ongoing adherence to agreed-upon plans for coordinated pork production limits.

86.     During the conspiracy, Agri Stats' reports were organized by company and facility, but their names were not listed in the reports. Nevertheless, while ostensibly anonymous, the reports contained such detailed figures covering many aspects of pork production and sales that participants could accurately identify the companies behind the metrics. For example, long-time industry insiders were sufficiently familiar with each other to identify unique but recurring data points for other companies, as well as identify the other companies by general metrics and size. The Packer/Processor Defendants and Co-Conspirators decoded the Agri Stats' reports, so they knew their rivals' Competitively-Sensitive Information. Moreover, Agri Stats knew during the conspiracy that the anonymity of its system was compromised by individuals who had gleaned knowledge of competitors' identification numbers.

87.     Packer/Processor Defendants received as many as one dozen books of data at the end of each quarter, augmented by smaller monthly update books featuring the latest year-to-date information. Within these smaller monthly books, each Packer/Processor Defendants' rows of year-to-date numbers were highlighted. In the front of each book, there were also markings indicating which companies' numbers were inside the book. The front of the book also included information indicating which other companies were represented in the data, though which number represented each competitor was not listed.

88.     Agri Stats mailed the reports to its customers. On occasion, Agri Stats reportedly shipped a participant's book to one of its competitors. At times, participants reportedly kept their competitors' books for future reference, which as noted above revealed the identity of that participant given that their numbers were highlighted by Agri Stats in their books.

89.     Mobility within the meat production industries led to a situation in which workers at Packer/Processor Defendants and Co-Conspirators' production facilities knew the numbers of other regional facilities, removing any anonymization of the data that existed. Agri Stats would hire industry participants to work in its offices, and then they would return to the industry knowing each of the allegedly "anonymous" numbers.

90.     After decoding the information contained in the Agri Stats reports, the Packer/Processer Defendants had discussions regarding the content, process, value, and confidentiality of the information obtained from decoding the Agri Stats reports.

91.     During the conspiracy, Agri Stats was aware of these facts. Agri Stats knew that Packer/Processor Defendants were able to decode the information, and had identified specific competitors in the Agri Stats reports. In fact, Agri Stats was not only aware that Packer/Processor Defendants had identified competitors in the reports—Agri Stats actively assisted the Packer/Processor Defendants in doing so.

92.     Agri Stats' detailed statistics—coupled with its regular, in-person meetings with each Packer/Processor Defendant and Co-Conspirators and routine participation in trade association events widely attended by each of the Packer/Processor Defendants' senior executives—served an indispensable monitoring function, allowing each member of the cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."

28

93.     Agri Stats' critical importance for a collusive scheme in the pork industry lies not only in the fact that it supplied the data necessary to coordinate production limits and manipulate prices, but also in its stabilizing power. Price fixing cartels may be unstable in the absence of policing mechanisms, as each individual member of the cartel may have an incentive to cheat on other members of the cartel, for example, by increasing pork production to capture higher prices and market share as other cartel members limit their production. Agri Stats' detailed production statistics served as an indispensable monitoring function, allowing each member of the conspiracy to police each other's production figures (which were trustworthy because they had been verified) for signs of cheating.

94.     There is no plausible, non-conspiratorial justification for the Packer/Processor Defendants and Co-Conspirators to use Agri Stats to secretly share highly confidential and proprietary information about their hog size and age, pricing, capacity, production, and costs at the level of detail at which they did. In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic theory shows how the routine exchange among competitors of such sensitive internal company information reduces competition.

95.     One chicken industry expert testified in a case against Pilgrim's Pride, a subsidiary of Co-Conspirator JBS, brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181–229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most producers is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.

96.     When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

97.     A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors . . . are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company . . . started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

98.     A 2017 *Bloomberg* News article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their chicken cartel, which is equally applicable to the pork cartel alleged in this Complaint:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Stats while researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data—for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of

30

collusion, Carstensen says, because it allows Co-Conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your Co-Conspirators have the kind of information that gives them confidence—so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."

99.     There remains a continuing and real threat of anticompetitive conduct by Defendants and Co-Conspirators because of, among other reasons, the continued existence of Agri Stats' reports with Competitively-Sensitive Information, Defendants and Co-Conspirators' opportunities to collude, the characteristics of the pork market, and the extent to which Packer/Processor Defendants and/or Co-Conspirators  continue to exchange Competitively-Sensitive Information with each other through the Agri Stats reports.

**VIII.    The market for the production and supply of pork was conducive to collusion.**

100.     As explained below, there were one or more conditions and events in the pork industry during the conspiracy, or "plus factors," that made the market for the production and sale of pork conducive to cartelization.

**A.  Pork is a commodity product with inelastic demand.**

101.     Pork products are a commodity or possess commodity-like characteristics in that the product of one seller is interchangeable with the product of another. Pork had this characteristic during the conspiracy and at other times relevant to Plaintiffs' claims.

102.     As such, all things being equal, it would not be profitable for Packer/Processor Defendants and their Co-Conspirators to unilaterally increase pork prices in the United States, because a unilateral price increase by any one Packer/Processor Defendant or Co-Conspirator would allow another Packer/Processor Defendant or Co-Conspirator to take substantial market share by simply holding its price. But the commodity or commodity-like characteristic of pork products made the market for the production and sale of pork conducive to cartelization.

103.    Inelastic demand means that it is profitable for members of a cartel to raise the price of a good above competitive levels. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price. Price elasticity of demand is a measure used to quantify the degree to which quantity demand for a good or service changes with respect to price.[18] A price elasticity of demand value between 0 and -1 indicates there is inelastic demand for the good or service, *i.e.*, a 1 percent increase in price induces a less than 1 percent decrease in quantity demanded. Markets with a highly inelastic demand can help facilitate collusion as producers have the ability to raise prices without a significant impact on quantity demanded. Research shows that the demand for pork is inelastic, and that there is limited substitution between pork and other meat products.[19] During the conspiracy and at other times relevant to Plaintiffs' claims, the demand for pork was inelastic.

104.    Collusion becomes easier for manufacturers of a homogenous product when prices are the only way in which products can be differentiated from one another. Pork loin, bacon, ribs, and other pork products are produced on a commercial scale and sold in supermarkets. For example, as alleged above, pork loin from Tyson and Smithfield is virtually indistinguishable, with

---

[18] *See, e.g.*, Jeffrey M. Perloff, Microeconomics with Calculus, 28–31 (2d Ed.); Patrick L. Anderson, *et al.*, Price Elasticity of Demand (Nov. 13, 1997), available at https://scholar.harvard.edu/files/alada/files/ price_elasticity_of_demand_handout.pdf; Gadi Fibich, Arieh Gavious & Oded Lowengart, The Dynamics of Price Elasticity of Demand in the Presence of Reference Price Effects, 33 J. Academy Mktg. Science 66–78 (2005).

[19] Ronald L. Meekhof, Pork Slaughter and Processing Sector Facility-Level Model, June 2007 (showing that a one-percent increase in the price of pork resulted in a 0.636 decrease in pork demand).

similar nutritional values, branding, and packaging. These products are highly substitutable, making it easier for competing firms to reach an agreement on a common pricing structure.[20]

105.    To the extent that a relevant market definition is or becomes necessary in this case, it is defined as the market for the production and sale of pork and pork products in the U.S., *i.e.*, the "Pork Market." As alleged earlier, the Packer/Processor Defendants and Co-Conspirators had greater than an 80% share of this relevant market, meaning they had substantial market power, during the conspiracy.

### B. The Packer/Processor Defendants and Co-Conspirators controlled the supply of pork in the United States, which allowed the conspiracy to succeed.

106.    The packer/processor sector of the market for pork production is horizontally concentrated (only a few companies buy, slaughter, and process the majority of hogs) and vertically integrated (pork packers have tight contractual relationships with hog producers throughout all stages of production).

107.    From approximately 1992 to 2009, the number of hog farms in the United States decreased by about 70%, from over 240,000 farms to 71,000 farms. Despite fewer hog farms, the nation's pork inventory remained relatively stable during this period, averaging about 60 million hogs.[21]

108.    During the conspiracy, however, there was increased control over the breeding, production, growing, and processing of pork by the Packer/Processor Defendants and Co-Conspirators through vertical integration and exclusive production contracts with hog farmers, and

---

[20] *See* Preventing and Detecting Bid Rigging, Price Fixing, and Market Allocation in Post-Disaster Rebuilding Projects, The United States Department of Justice, available at https://www.justice.gov/sites/default/ files/atr/legacy/2013/01/31/disaster_primer.pdf

[21] *See* https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=77923.

by pressure exerted by AgStar as a key lender to hog producers (as encouraged by the Packer/Processor Defendants).

109. Vertical integration is so pervasive that the Packer/Processor Defendants are commonly called pork or swine "integrators" by the industry, government, analysts, and academics. Vertical integration allows the Packer/Processor Defendants and Co-Conspirators to control directly the production and supply of pork through their wholly-owned and operated farms, where hogs were raised, fed, and prepared for slaughter. Fully integrated companies have broad control over production processes, and near-total operational discretion in deciding how much to produce and when.

110. Under pork production contracts, "a contractor or integrator provides pigs or breeding stock, feed, and other services to a producer or grower who manages the hogs at his or her farm until animals are ready for market or transfer to other farms."[22] This arrangement essentially converts independent farmers into contract employees who perform services for the pork processor. The Packer/Processor Defendants and Co-Conspirators typically paid only fixed service fees to the farmers, who bore the investment costs of the hog-raising facilities. The Packer/Processor Defendants and Co-Conspirators typically retained ownership of the hogs and set the terms for how they were raised, allowing them to further control the supply of the pork on the market. The prevalence and use of contracts for hog production by Packer/Processor Defendants and Co-Conspirators increased significantly during the conspiracy. For example, during Hormel's 2012 fiscal year, it purchased approximately 97% of its hogs under supply

---

[22] Allen Harper, *Hog Production Contracts: The Grower-Producer Relationship*, Virginia Cooperative, Virginia Cooperative Extension (2009).

contracts. By 2017, there reportedly were only a small number of independent producers who sold hogs without contracts, to the open market where bids were transparent.[23]

111.     Pork production starts at the farrowing stage—which is the term used to describe a female hog giving birth. Female hogs used in the farrowing stage are called "sows." Sows will normally have anywhere from 11 to 13 pigs per litter. With a sow being able to farrow close to three times a year, one sow can have around 36 piglets in one year.

112.     After birth, piglets grown for meat consumption are moved to a nursery for about six to eight weeks, or until the pig weighs upwards of 50 pounds. At the last stage of production, the pigs will spend around 16 weeks in a finishing barn, reaching a final weight of over 250 pounds. After the pigs reach their final weight, they are sent to a packing plant to be harvested. Importantly in the context of this case, due to the nature of the pork production cycle, the reduction of sows— *i.e.*, farrowing hogs—has a significant impact on the supply of hogs and the supply of pork and pork products.

113.     The following diagrams show the path for pork raised for meat consumption from birth through sale to entities such as Plaintiffs and the overall value chain of the U.S. pork market:

---

[23] *See e.g.*, 2019 Hormel Annual Report, at 8 ("The live hog industry has evolved to large, vertically-integrated operations using long-term supply agreements. This has resulted in fewer hogs being available on the case spot market. Consequently, the Company uses long-term supply contracts based on market-based formulas or the cost of production to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term.").

**Figure 3: Pork Supply Chain**



**Figure 4: Value Chain of U.S. Pork Market**



114.    During the Conspiracy Period, Co-Conspirator Smithfield was the largest producer and processer of pork in the United States. At the start of the conspiracy, Smithfield had approximately 1.1 million sows and produced 18.7 million market hogs per year in the United

States. By 2014, Smithfield reportedly had approximately 500 company-owned farms and about 2,190 contract farms in the United States. Smithfield's 2014 annual report described its arrangement with contract farms as follows:

> Under our contract farm arrangements, contract farmers provide the initial facility investment, labor and frontline management in exchange for fixed service fees to raise hogs produced from our breeding stock under agreements typically ranging between five and ten years. We retain ownership of the hogs raised by our contract farmers. In 2014, approximately 76% of Smithfield's hogs produced in the U.S. were finished on contract farms.

115.    Defendant Seaboard stated in its 2009 annual report: "In 2009, Seaboard raised approximately 75% of the hogs processed at its Guymon, Oklahoma plant with the remaining hog requirements purchased primarily under contracts from independent producers."[24] In fiscal year 2016, that number of Seaboard-owned hogs processed had increased to 81%. In fiscal year 2017, it increased again to 87%. In fiscal year 2018, it increased again to 89%. In its 2017 SEC 10-K report, Seaboard stated that it raised "over five million hogs annually primarily at facilities owned by Seaboard or at facilities owned and operated by third parties with whom Seaboard has grower contracts." During the conspiracy, Seaboard also sold pork produced in Triumph's plant or produced in a plant jointly owned by Seaboard and Triumph.

116.    Vertical coordination was key to other defendants, including Defendant Clemens Food Group, which touts its vertical coordination on its website: "Our vertically-coordinated company directly oversees the entire production chain, from the farm all the way to our retail and foodservice customers."[25] A key part of Clemens' vertical coordination efforts includes utilizing a hog procurement and production subsidiary, Country View Family Farms, which manages a

---

[24] 2009 Seaboard Annual Report, at p. 11.

[25] *See* Clemens Food Group, *Vertically Integrated Purposefully Coordinated* (*available at* http://www.clemensfoodgroup.com/our-company/vertically-coordinated).

network of 100 farms raising hogs under contract throughout Indiana, New York, Ohio, and Pennsylvania.[26]

117.    Similarly, a primary consideration in Co-Conspirator JBS's purchase of Cargill's pork business in 2015 was that it gave JBS more control over the production of hogs, by acquiring four hog farms.

118.    Defendant Triumph was created with vertical integration in mind as it was started by five of the largest pork producers in the U.S.—Christensen Farms, The Hanor Company, New Fashion Pork, TriOak Foods, and Eichelberger Farms—as well as Allied Producer's Cooperative, a group of producers in Iowa, Nebraska, Kansas, and Minnesota. The relationship with these owner producers allows Triumph to control the pork production process from start to finish.

119.    Defendant Tyson stated in its 2009 10K Report: "The majority of our live hog supply is obtained through various procurement relationships with independent producers."[27] Through these contracts, Tyson asserted control over hog production. Additionally, Tyson raised a number of weanling swine to sell to independent finishers and supply a minimal amount of live swine for its processing needs.

120.    Likewise, Defendant Hormel is a vertically integrated company with control over live hog operations as well as pork processing and production facilities. Hormel stated in its 2009 annual report: "The live hog industry has evolved to very large, vertically integrated, year-round confinement operations operating under long-term supply agreements."[28] Accordingly, Hormel

---

[26]  *See id.*; *see also* The Clemens Family Corporation Companies (*available at* http://www.clemensfamilycorp.com/pages/companies.aspx).

[27]  2009 Tyson 10-K, at p. 4, https://s22.q4cdn.com/104708849/files/doc_financials/annual/Tyson_FY2009_10K.pdf.

[28]  2009 Hormel 10-k, at p. 32. https://d18rn0p25nwr6d.cloudfront.net/CIK-0000048465/f625f7ed-f161-478e-94f1-6b1ff37eeb31.html.

"uses long-term supply contracts to ensure a stable supply of raw materials while minimizing extreme fluctuations in costs over the long term" accounting for 93% of the hogs purchased by Hormel in 2009.[29]

121.    Co-Conspirator Indiana Packers' website notes that it is "a fully integrated pork company operating entirely within the heart of the Midwest," and heralds the company's "pork-exclusive expertise and vertically integrated operation."

122.    Each of the Packer/Processor Defendants and Co-Conspirators further controls the manner in which pork is processed and has the ability to restrict and reduce available supply in the United States through a number of means, including capacity reductions, controlling slaughter rates, and exports.

123.    Defendants including Clemens, Tyson, Hormel, Seaboard, and Triumph, and Co-Conspirators Smithfield, JBS, Indiana Packers, Daily's Premium Meats, and Seaboard Triumph Foods, sell packaged pork under various brand or trade names.

124.    Each Packer/Processor Defendant and Co-Conspirators' annual sales of pork products are also very substantial. For instance, in 2016, Smithfield reported $5.089 billion of fresh pork sales, and an additional $7.089 billion in packaged pork product sales.[30] That same year, Tyson reported $4.9 billion in pork sales.[31] These substantial revenues meant that during the conspiracy, if the Packer/Processor Defendants and Co-Conspirators could successfully fix, increase, stabilize and/or maintain pork prices at artificially elevated levels (which they did), then

---

[29] *Id.*

[30] Smithfield 2016 10-K at 40.

[31] Tyson 2016 10-K at 27.

this would (and did) translated into significant overcharges by Plaintiffs and others and substantial profits for the Packer/Processor Defendants and Co-Conspirators.

### C. The market for the production and sale of pork was concentrated.

125.    Meatpacking concentration levels are among the highest of any industry in the United States, and well above levels generally considered to elicit non-competitive behavior and result in adverse economic performance. This high level of concentration in the pork processing industry was optimal for collusion.

126.    During the Conspiracy Period, the market for the production and sale of pork products was dominated by the Packer/Processor Defendants and packer/processor Co-Conspirators. As alleged above, the Packer/Processor Defendants and Co-Conspirators had more than an 80% share of the U.S. market for the production and sale of pork products. But for the conspiracy alleged in this Complaint, the Packer/Processor Defendants and packer Co-Conspirators would have had to compete on price.

//

//

//

//

//

//

//

//

//

//

127.     Prior to and in the beginning of the Conspiracy Period, the pork industry underwent a period of unprecedented concentration, resulting in a small number of pork packers/processors controlling a large amount of market share. Between 1988 and 2015, just the top four pork processors (Smithfield, Tyson, JBS, and Hormel) increased their market share from 34 percent in 1988 to 70 percent by 2018. This is show in Figure 5 below:

**Figure 5: Market Concentration of Four Largest Companies**



128.     In 1999, Co-Conspirator Smithfield acquired Carroll's Foods, Inc., which was, at the time, the second largest hog production company in the U.S., and its affiliated companies and partnerships. In 2003, Smithfield acquired Farmland Foods, which was, at the time, the sixth largest pork processor in the United States. In 2016, Smithfield announced the acquisition of farm operations in three U.S. states from Hormel Foods Corp.

129.     In July 2015, Co-Conspirator JBS announced that it would acquire Cargill's pork business for $1.45 billion. The acquisition joined the third and fourth largest pork packing companies to surpass Tyson and became the second largest hog processor in the United States,

behind only Smithfield. As noted above, the acquisition allowed JBS to exercise greater control over the production of pork, by acquiring four hog farms and over the processing of hogs by acquiring two packing plants operated by Cargill.

130.    The Cargill acquisition was completed in October 2015 and resulted in further consolidation in the industry. The resulting JBS pork business had pro forma net revenue of approximately $6.3 billion, and a processing capacity of about 90,000 hogs per day and two million pounds of bacon per week. After the acquisition closed, the new JBS-Cargill entity was twice as large as fourth largest pork processor (Hormel), and four times larger than the fifth and sixth largest firms (Triumph and Seaboard, each with approximately five percent of the national slaughter capacity).

131.    The following timeline summarizes notable mergers and joint ventures between pork processors since 1995, which led to an increased market concentration:

### Figure 6: History of Merger and Acquisitions



132.    As shown in Figure 7 below, by 2016, the top six pork processors comprised 82% of the total market. The top two pork processors alone comprised over 45% of the market share, with Smithfield holding the largest overall share of the market at 26%.

133. On their own, it would be difficult for any of these companies to exercise market power. However, acting collectively to manipulate the price of pork products, the combined market share of the six largest pork processors, *i.e.*, the Packer/Processor Defendants and Co-Conspirators, translates into an HHI[32] of 6724 (ignoring other pork processors that comprise the other 18% of the market), which is well above the threshold for highly concentrated markets. In other words, if, as alleged in this Complaint, the Packer/Processor Defendants and Co-Conspirators colluded with one another to restrict the domestic supply of pork—which they did—then the resulting market concentration of this concerted action gave them more than sufficient power to control the pork market. Even without combining the largest six pork processors, the pork industry had a "moderately concentrated" HHI of 1532.

**Figure 7: 2016 Pork Processing Market Shares[33]**



| | Market Share | HHI-Independent | HHI- Collusion |
|---|---|---|---|
| Smithfield | 26% | 676 | |
| JBS | 20% | 400 | |
| Tyson | 18% | 324 | |
| Hormel Foods | 8% | 64 | |
| Triumph Foods | 5% | 25 | |
| Seaboard Farms | 5% | 25 | 6724 |
| Others | 18% | 18 | 18 |
| Total | 100% | 1537 | 6742 |

---

[32] "HHI" means the Herfindahl-Hirschman Index, a measure of market concentration used by the Department of Justice. *See* https://www.justice.gov/atr/herfindahl-hirschman-index. A HHI value of 1,500 to 2,500 suggests a market is moderately concentrated. An HHI in excess of 2,500 points suggests a market is highly concentrated.

[33] Ken Sullivan, *Globalization of Agriculture: An Ownership and Market Perspective* (March 7, 2017).

134.     WH Group Limited, which acquired Smithfield in 2013, characterized the U.S. pork integration industry as "relatively mature and concentrated."[34] Both of these conditions—maturity and concentration—made the pork industry more susceptible to collusion.

135.     The level of concentration in the pork integration industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a relatively small number of pork processors, *i.e.*, the Packer/Processor Defendants and processor Co-Conspirators, it was feasible for them to manipulate price through an agreement among them, whose market power greatly simplified the organizational complexity of the conspiracy. Further, because the Packer/Processor Defendants and Co-Conspirators were incapable of independently controlling pork prices on their own, such an agreement was necessary to artificially inflate pork prices above a competitive level.

136.     Concentration of the industry was also beneficial to the procurement of hogs by the pork processors. In some regions, consolidation resulted in cases in which only one pork processor was left to buy hogs from independent farmers, leaving the farmers with no leverage when negotiating terms with the pork processors.[35]

//

//

//

//

//

//

---

[34] WH Group Interim Report, at p. 5 (2017).

[35] Wise, Timothy A. and Sarah E. Trist, "Buyer Power in U.S. Hog Markets: A Critical Review of the Literature", Global Development and Environment Institute, Working Paper No. 10-04, August 2010, at pp. 3 and 11.

137.     In addition to market concentration, market stability is consistent with the conspiracy alleged in this Complaint. Figure 8 below shows not only that the Packer/Processor Defendants and Co-Conspirators' collective share of the market was high during the conspiracy, but also that their market shares were relatively stable during this period:

**Figure 8: Market Concentration and Market Share Stability U.S. Market Share by Hog Slaughter Capacity[36]**



**D.  There were barriers to entry in the market for packing and processing.**

138.     Large barriers to entry kept potential competitors out of the pork processing industry during the conspiracy. New entry into pork processing was costly and time consuming. Construction of a large-scale slaughter facility would take hundreds of millions of dollars and the additional planning, design and permitting costs were substantial. For example, in 2012, it cost

---

[36] This data comes from Pork Checkoff and several issues of Hog Farmer. The figure omits 2008 and 2010 due to data sourcing issues for those years.

Cargill $25 million just to expand an existing facility. During the conspiracy, constructing a facility from scratch would have cost considerably more money, totaling hundreds of millions of dollars.[37] Indeed, Seaboard Triumph Foods's 600,000 square foot plant in Sioux City cost $264 million to build.

### IX.    Select trade associations facilitated collusion.

139.    Industry trade association and trade group (collectively "trade groups") meetings and events brought together senior executives from Defendants and Co-Conspirators and gave them the opportunity to discuss restricting the pork supply and artificially elevating pork prices. Against this backdrop, and knowing now that during the conspiracy, the Packer/Processor Defendants and Co-Conspirators were privately exchanging their respective Competitively-Sensitive Information with each other through the Agri Stats reports and signaling or communicating with each other publicly about their intention to restrict pork supply, it is plausible that Defendants and Co-Conspirators were secretly discussing the collective restriction of the pork supply when their executives met at or incident to these trade group meetings or events.

140.    In addition to the Pork Club and the American Meat Institute (AMI)—which were both important to the operation of the conspiracy alleged in the Complaint—other examples of pork industry trade groups in which Packer/Processor Defendants and Co-Conspirators participated during the conspiracy and that allegedly provided cover for the collusion include, without limitation: (a) the National Pork Producers Council (whose members included Cory Bollum of Hormel Foods, Don Butler of Smithfield Foods/Murphy-Brown LLC, Chris Hodges of Smithfield Foods, and Todd Neff of Tyson Fresh Meats); (b) the Pork Industry Forum; (c) the

---

[37] *Anticompetitive Impacts of Proposed JBS-Cargill Pork Acquisition* (White Paper), July 2015 at p. 7.

World Pork Expo; (d) the National Pork Board (whose members included at least three executives associated with Smithfield (Conley Nelson, Chris Hodges, and Michael Skahill);[38] (e) the National Pork Industry Conference (met annually and included the top pork production systems in North America); (f) the International Production and Processing Expo (attended by Packer/Processor Defendants and Co-Conspirators); and (g) the U.S. Meat Export Federation.

141.    According to its website, "[t]he National Pork Producers Council (the "Pork Council"), which consists of 42 affiliated state associations, is the global voice for the U.S. pork industry, enhancing opportunities for the success of pork producers and other industry stakeholders by establishing the pork industry as a consistent and responsible supplier of high-quality pork to domestic and world markets."[39]

142.    The Pork Council conducts its annual business meeting and election of officers and directors during its "National Pork Industry Forum" typically held in early March each year. The Pork Council advertises the National Pork Industry Forum as an opportunity for networking, as well as attending educational sessions. The event includes a candidate meet and greet, state caucuses, meals and receptions, and delegate sessions.

143.    In addition to its annual National Pork Industry Forum, the Pork Council sponsors many other programs that have provided ample opportunities for defendants to meet with each other in person, including:

- The annual "World Pork Expo" at the Iowa State Fairgrounds advertised as the "world's largest pork-specific trade show." It includes exhibits, seminars (including market outlook presentations), a golf tournament, and pre-show tours of industry- related organizations (including tours of

---

[38] *National Hog Farmer,* "Pork Checkoff names 2019-2020 officers," (Jun 5, 2019), available at: https://www.nationalhogfarmer.com/business/pork-checkoff-names-2019-20-officers.

[39] National Pork Producers Council, NPPC.org.

producer farms). The National Pork Board has conducted its annual meeting to elect new officers during the World Pork Expo.

- Legislative Action conferences each spring and fall in Washington DC

- A public policy Leadership Institute, which brings small groups of pork industry representatives together for a "comprehensive" training program "designed to develop future leaders for the pork industry."

144.    The National Pork Industry Conference ("NPIC") is an annual industry event that includes speakers, break-out sessions, networking opportunities, and a golf tournament. NPIC's list of sponsors include the NPPC, Smithfield, Hormel, and Tyson.[40] Descriptions on the conference website have said that the Pork Industry Conference "is the largest annual conference in the US that is held for the swine industry," and has had 750 to "over 900" attendees each year, representing "the Top 150 pork production systems in North America."

145.    The website for the 2016 NPIC's conference, emphasized networking opportunities and promoted the "Focusing on Markets" session "led by industry economic experts." Seaboard Foods and Smithfield Foods are among the Packer/Processor Defendants and Co-Conspirators whose executives have been presenters at the Pork Industry Conference.

146.    CEOs and top-level executives from the Packer/Processor Defendants attending the NPIC and the Pork Council events discussed topics with one another relating to pricing, production, processing and other non-public, proprietary information in a number of informal settings. These regular, informal, and in-person opportunities to discuss pricing, production, and processing in the pork industry give CEOs and top-level executives comfort that their competitors remained committed to a plan to artificially restrict pork production and processing.

---

[40] *See* NPIC, Sponsors, available at https://porkconference.com.

147.     In addition to the large pork industry associations, there are smaller pork clubs that permit members to meet regularly to privately discuss competitive issues. For example, the 21st Century Pork Club, founded in 1997 by former Pork Council executive Larry Graham, meets twice a year. Individuals who attended Pork Club events during the Conspiracy Period included representatives of at least the following Packer/Processor Defendants: Tyson, Triumph, Seaboard, Hormel, and Clemens, as well as Co-Conspirator Smithfield. A March 2011 Agri Marketing article about the club states that it consisted of "60 industry stake holders" and that members will be dismissed from the group if they miss two meetings in a row without a valid reason.

148.     Certain Defendants also attended meetings organized by the Packer Processor Industry Council ("PPIC"). The PPIC is a group of pork packers, processors, and further processors. Individuals who held leadership positions with PPIC include Hormel's Corwyn Bollum and Tyson's Todd Neff. Individuals who attended PPIC events during the Conspiracy Period include representatives of at least the following Packer/Processor Defendants: Hormel, Tyson, Seaboard, and Clemens, as well as Co-Conspirators Smithfield and JBS.

149.     During the Conspiracy Period, Defendants were able to meet with each other not only at pork-specific events, but also at the many meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI"), its predecessor, the AMI, and other organizations.

150.     Until its 2015 merger into NAMI, AMI described itself as "the nation's oldest and largest meat and poultry trade association." AMI's website routinely boasted that AMI's Packer and Processor Members "cover 95 percent of the nation's beef, pork, lamb and veal products and 70 percent of the nation's turkey products" and touted the "excellent networking and information-

sharing opportunities for members of the industry" provided by AMI's "many meetings and educational seminars."

151.    NAMI was formed in 2015 by merging the AMI and the North American Meat Association. The NAMI website states that NAMI is "a national trade association that represents companies that process 95 percent of red meat and 70 percent of turkey products in the US and their suppliers throughout America," and its "many meetings and educational seminars . . . provide excellent networking and information-sharing opportunities for members of the industry."

152.    All of the Packer/Processor Defendants (or their closely-affiliated companies) have been members of AMI and then NAMI throughout the Conspiracy Period. Executives from the Packer/Processor Defendants and Co-Conspirators have served on the AMI and NAMI Board of Directors during the Conspiracy Period, including:

- Mark Campbell and Rick Hoffman of Triumph Foods;

- Doug Clemens and Phil Clemens of Clemens Family Corporation;

- Tom Hayes, Jim Lochner, Mike Larson, and Sara Lilygren of Tyson Foods, Inc.;

- Michael Skahill, Keira Lombardo, Robert "Bo" Manly, and Larry Pope of Smithfield Foods, Inc.;

- Gary Louis, Rod Brenneman and Terry Holton of Seaboard Foods;

- Andre Nogueira, Wesley Batista, Martin Dooley, Rich Vesta, and Bill Rupp of JBS;

- Jim Snee, Stephen Binder and Jeffrey Ettinger of Hormel Foods Corporation; and

- Gary Jacobson and Russ Yearwood of Co-Conspirator Indiana Packers Corporation.

153.    Almost all of these executives also serve or have served on the 25-person AMI and/or NAMI Executive Committees, and several have been among the five officers of AMI or NAMI, including Sara Lilygren, of Tyson Foods, Jeffrey Ettinger of Hormel Foods Corporation, and Rod Brenneman of Seaboard Foods.

154.     Throughout the Conspiracy Period, AMI (through 2014) or its offshoot the American Meat Institute Foundation (since 2015) has sponsored the industry's "Annual Meat Conference." The conference website describes the conference as "a complete education and networking experience." Many of the Defendants' high-level executives attend the conference.

155.     Throughout the Conspiracy Period, the Annual Meat Conference has included a plenary session focused on how economic issues affect the meat industry, usually entitled "The Economy and Its Impact on Your Business" or "Market Outlook for Meat and Poultry." All (or almost all) of these sessions included a presentation on the pork industry by Steve Meyer, Ph.D., President of Paragon Economics until 2015, and then Vice President of Pork Analysis at Express Markets, Inc. (an affiliate of Agri Stats) through 2017.[41] The description for the 2015 presentation stated that it would address "how you may need to adapt your business because of consumer spending trends, unemployment rates and industry capacity."

156.     The descriptions of the 2016, 2017, and 2018 sessions were virtually identical to each other: "The economic impact of changing meat, poultry, and livestock supply and demand conditions provide challenges for producers and retailers alike. This session will take an in-depth look at the beef, pork, and poultry markets and explore how factors including weather, animal health, and changing export markets continue to impact domestic availability and prices. Understanding changes in consumer spending and worldwide economic trends, combined with the knowledge of what to expect in livestock markets, will help you prepare for the coming years."

---

[41] *Annual Meat Conference,* "2015 AMC Brochure," at 5, http://www meatconference.com/sites/default/files/books/2015_AMC_Brochure.pdf; *Annual Meat Conference,* "2016 AMC Brochure," at 6 http://www meatconference.com/sites/ default/files/books/2016_AMC_Brochure.pdf and *Annual Meat Conference,* "2017 AMC Brochure," p. 5, http://meatconference.com/sites/default/ files/books/2017_MeatBrochure.pdf

The 2016 through 2018 plenary sessions were followed by a "Market Outlook Extended Q&A" for small group discussion.

157.    Until 2016, first AMI and then NAMI held an Annual Meeting and Outlook Conference each fall. The NAMI website described the 2015 annual meeting as "a great networking and educational opportunity for the entire industry" with presentations on "key industry topics . . . as well as outlook sessions for 2016 and the member to member education provided by Issues Answers Action." Scheduled presenters at the Annual Meeting and Outlook Conference have included Cameron Bruett of JBS in 2015, and Phil Clemens of The Clemens Family Corporation in 2016.

158.    For years, NAMI also sponsored an annual "Meat Industry Management Conference." NAMI promoted the 2015 meeting as focusing on a variety of topics, including "economics, and general business topics" and an "always popular Answers Actions session" that "provides structured member interaction on a variety of issues and topics." The NAMI board met during the 2015 Management Conference.

159.    In April 2017, NAMI replaced the Annual Meeting and Outlook Conference and the Meat Industry Management Conference with an annual "Meat Industry Summit" at which John Nalivka of Sterling Marketing made a presentation about economic issues regarding the meat industry.[42] In addition to education sessions, the summit has included, "networking opportunities and social events," including a golf tournament, receptions, and an Issues, Answers, Actions Breakfast, as well as the annual Board of Directors meeting and what one publication described as "closed door committee meetings to discuss policies and association business."

---

[42]   Meat and Poultry, *NAMI Offers New Meat Summit,* Feb. 16, 2017, https://www meatpoultry.com/articles/15855-nami-offers-new-meat-summit.

160. AMI sponsored the "International Meat, Poultry & Seafood Convention and Exposition" in 2009, 2011, and 2012. In at least 2009 and 2011, AMI conducted its business meeting during the Expo, electing members of its board of directors.

161. In January 2013, AMI's International Meat, Poultry & Seafood Convention and Exposition was integrated into the "International Production and Processing Expo" ("IPPE"), co-produced by AMI and poultry and feed trade associations. Promotional materials for the 2014 IPPE indicated that attendees included Clemens Food Group, Hormel Foods, JBS, Seaboard, Smithfield Foods, Triumph Foods, and Tyson. After AMI's 2015 merger into NAMI, NAMI became (and still is) a presenting sponsor, along with the poultry and feed trade associations.

## X. Defendants and Co-Conspirators implemented collusive, anticompetitive capacity and processing restrictions.

### A. Overview of the restriction of the pork supply during the conspiracy.

162. This Section alleges facts relevant to the start of the conspiracy, and then provides a chronology of certain actions taken by and communications from the Defendants and Co-Conspirators pursuant to the conspiracy.

163. Defendants and Co-Conspirators' secret exchange of Competitively-Sensitive Information about each other through Agri Stats in a market with conditions that made it conducive to cartelization made possible their implementation and enforcement of an understanding or agreement among the Packer/Processor Defendants and Co-Conspirators to fix, increase, maintain, and/or stabilize pork prices by restraining the domestic supply of pork.

164. In the years leading up to the Conspiracy Period, the steady expansion of pork production was virtually a given. As one industry commentator reported in 2007: "Some things

you can just take to the bank. Sow herd expansion among the Pork Powerhouses would fall into that category—even in the face of the biggest run-up in feed prices in history."[43]

165.    This historical trend changed markedly during the Conspiracy Period as Packer/Processor Defendants and Co-Conspirators dramatically shifted their behavior and restricted the pork supply in an act that was against their self-interest unless, as was the case, they had an understanding or agreement to restrict the domestic pork supply through collective action.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

---

[43] Freese, Betsy, *Pork Powerhouses 2007: Run-Up In Rations* (Oct. 3, 2007).

166.     As demonstrated in Figure 9 below, at several points during the conspiracy, the Packer/Processor Defendants and Co-Conspirators changed their behavior and acted in a concerted way to decrease pork supply. With their conspiracy in place, in 2008 and 2009, and again in 2012 and 2013, the pork industry cut production.[44] These industry production decreases, shown by negative annual growth rates, marked a drastic change in the Packer/Processor Defendants and Co-Conspirators' business practices from the period prior to the conspiracy from 2000, in which pork supply was stable and steadily increasing on a yearly basis.

**Figure 9: U.S. Annual Commercial Hog Production, 2001-2020**



167.     These supply cuts were historic, unprecedented, and coordinated among Packer/Processor Defendants and Co-Conspirators. For example, in September 2009, *Pork Powerhouses*—an annual report of the largest pork producers in the United States, published by *Successful Farming* magazine—titled its annual report "Big Boys Cut Back," and reported that "[f]or the first time since the annual Pork Powerhouses ranking was launched in 1994, the nation's

---

[44] *See* U.S. I.T.C. Office of Industries, "Pork and Swine industry and Trade Summary" at 2 (Pub. ITS-11 Oct. 2014) (noting that slaughter capacity utilization generally declined between 2008 and 2013); id. at 19 (stating that the number of animals kept for breeding by U.S. swine producers declined between 2008-2010, and that in 2012 the number of animals kept for breeding remained 5 percent below the level observed in 2008).

largest 25 producers have cut sow numbers. These companies report 200,000 fewer sows than one year ago, a drop of 6.4%.[45]

168.     These supply cuts were not easily reversible. For example, as alleged above, attempting to replace breeding sows takes considerable time, during which a company could lose meaningful market share to its competitors with no ability to rapidly increase production to retain its customers, unless its competitors also cut their production. In other words, each Packer/Processor Defendant and Co-Conspirator took significant business risk by restricting output. Their production restrictions were not economically rational without coordination among them as alleged in this Complaint.

169.     While the Packer/Processor Defendants and Co-Conspirators were restricting pork production, they also further reduced the domestic supply of pork by increasing exports. The U.S. has been a net exporter of pork for a long time, but those exports have comprised a much larger share of total production in the past ten years. As shown by Figure 10 below, less than 10% of U.S. pork production was exported in 2000. By 2011, more than twenty percent was being exported. Sending pork products overseas is another way in which each of the Packer/Processor Defendants was able to reduce the supply available to U.S. markets, thereby driving up prices. The significant expansion in exports meant that even increases in hog production did not result in an increased supply of pork products in the United States market.

//

//

//

---

[45] Freese, Betsy, *Pork Powerhouses 2009: Big Boys Cut Back* (Sep. 14, 2009).

**Figure 10: US Pork Exports as a Percent of Total Production, 2000-2017**



170.     This evidence that Defendants were increasing exports despite declining (or flat) prices is consistent with record evidence suggesting that exported pork was often sold at lower prices than it would have received domestically, sometimes at a loss.

171.     By restricting the supply of pork, even when confronted with increasing demand, Packer/Processor Defendants' and Co-Conspirators' common goal was to increase the price of pork and their margins. In 2012, the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."[46]

172.     Later in the Conspiracy Period, when domestic hog production began increasing again, the importance of pork exports grew even further.

---

[46] Transcript, Tyson Foods at Goldman Sachs Agribusiness Conference (Feb. 26, 2013).

173.    As part of their acts and conduct in furtherance of the conspiracy, each of the Packer/Processor Defendants and Co-Conspirators participated in these supply restraints as detailed below:

### 1.  Tyson

174.    Between 2008 and 2009, Tyson cut its sows by over 25%, from 70,000 sows to 50,000 sows, marking a significant reduction. In 2010, Tyson reported a 3.3% decrease in its pork sales volume coupled with increased export sales, which also accounted for a decrease in its capacity utilization rate. In 2013, Tyson reported a 3.6% decrease in sales volume and decrease in its capacity utilization in an effort to "balance[ ] our supply with customer demand."[47]

### 2.  Hormel

175.    In early 2008, Hormel announced that its Corcoran, California hog production division, Farmer John, cut its number of sows in 2008 by about 9,000. Hormel further reported tonnage reductions for its pork operations in its 2009 Annual Report. This is consistent with Hormel CEO's statement in January 2009 that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers [of hogs] that we had going through."[48] Hormel also reported lower sales of pork products in 2013. In June 2014, it was reported that Hormel reduced its capacity at its Los Angeles plant by 500 head per day.

### 3.  Seaboard

176.    Throughout the Conspiracy Period, including 2010 and 2011, Seaboard placed an increasing emphasis on exports and increased its volume of export sales. Seaboard dedicated several employees to international sales and exports. Seaboard also reduced pork supply in 2013

---

[47]   Chris Harris, "Tyson's Year Off to Good Start" *The Pig Site* (Feb. 4, 2013), https://www.thepigsite.com/news/2013/02/tysons-year-off-to-good-start-1.

[48]   Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

and, once again, these reductions had their intended effect—higher pork prices. Despite having an almost identical capacity as in 2012, Seaboard reported in 2013 that it had "lower sales volume of pork products in the domestic market," which resulted in "higher prices for pork products sold in the domestic market."[49]

177.    Seaboard understood that increased exports would reduce domestic supply of pork and raise prices, and made decisions on its domestic pricing based off of its competitors' export commitments.

178.    Seaboard also actively pursued export sales with the full understanding that increasing its volume of exports would reduce the supply of domestic pork and support higher domestic pork prices.

### 4. Triumph

179.    In September 2008, Christensen Farms, a member of Triumph Foods, reported that it had cut back 11,000 sows.[50] In 2009, Triumph reported substantial cutbacks of approximately 24,500 sows, representing over 6% of its members' sow herd, contributing to historic production restraints in the pork industry.[51]

180.    Additionally, Triumph focused its production on exports, and stated on its website that it was one of the top exporters of pork products worldwide. These exports constituted a significant portion of its production throughout the Conspiracy Period and reduced or otherwise limited Triumph's sales in the United States.

---

[49] *See* Seaboard 2013 Annual Report.

[50] Betsy Freese, *Pork Powerhouses 2008: The Big Squeeze* (Sep.4, 2008), available at https://www.agriculture.com/livestock/hogs/The-big-squeeze-Pork-Powerhouses-2008_283-ar4443.

[51] Betsy Freese, *Pork Powerhouses 2009: Big Boys Cutback* (Sep. 14, 2009), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-2009-big-boys-cut-back

### 5. Clemens

181.    In 2011, Clemens reported production of 1,000 fewer sows through its subsidiary Hatfield Quality Meats. Furthermore, in 2014, Clemens had a competitive advantage over many pork producers in that comparatively few of its pigs were affected by the virus causing porcine epidemic diarrhea (known as "PED" or "PEDv," which for several months disrupted the ability of many of Clemens' competitors to readily supply pork to the market). But contrary to what one would expect in a competitive market, Clemens did not utilize its advantage during the PED epidemic and refused to increase its market share when it clearly had substantial market incentives to do so.

### 6. Co-Conspirator Smithfield

182.    In 2008, Co-Conspirator Smithfield stopped instituting traditional production increases and instead reduced its number of sows, reporting: "We are focused on reducing the number of pigs that come off sow farms, and making sure the ones that come off are worthy of the investment in feed."[52]

183.    Given its market share, Smithfield knew that as long as a sufficient number of its competitors accepted its offer to reduce production—or not increase production sufficiently to make up for the reduction in production (*i.e.*, maintain production or increase production less than it could have)—then its significant production cuts would reduce herd inventory sufficiently to artificially increase, maintain, fix and/or increase pork prices. In 2009, Smithfield confirmed publicly—in a call to action to its co-conspirators—that it had already reduced the size of its U.S. herd by two million market hogs annually, and it was initiating a further reduction of 3% of its U.S. sow herd.

---

[52] Freese, Betsy, *Pork Powerhouses 2008: The Big Squeeze* (Sep. 4, 2008).

184.     The cuts were immediately effective, as Smithfield beat Wall Street analysts' expectations for the 4th quarter of 2009 and forecasted a profit in the current half of its 2010 fiscal year, driven by profits earned from the sale of packaged meats.[53] Smithfield made additional production cuts in 2010, reporting a cut in its domestic sow herd by 5% (about 45,000 sows).

185.     In 2011, despite increasing margins, Smithfield continued to downsize its sow herd, vowed publicly that it did not intend to increase capacity, and sold its Dalhart, Texas production facility to Cargill, Inc., which had been depopulated by August of 2009 as part of its sow reduction initiative.

186.     Smithfield also understood that reducing domestic supply would inflate prices. And Smithfield's executives recognized that increasing Smithfield's exports of pork products would lead to a reduction in supply of pork in the U.S. and higher prices for pork in the U.S.

187.     In June 2011, Smithfield CEO Larry Pope explained during an earnings call that the export market is like "heroin" that has been "fueling this industry in a positive way." Similarly, when asked why he was so optimistic about industry margins during a 2012 J.P. Morgan Global Protein Conference, Pope said, "One word: exports."

188.     Smithfield focused an increasing portion of its production on exports, with its sister company in China, Shuanghui Development, opening a plant in China in 2015 to turn pork sourced from Smithfield in the U.S. into packaged meat with the Smithfield label.

### 7.  Co-Conspirator JBS

189.     In 2011, Co-Conspirator JBS reported that in the prior two years, its pork export volume had grown from 15% to 20% of total production at JBS. Also, after acquiring Cargill's

---

[53]     Smithfield     Posts     Loss,     but     Beats     Forecasts,     available     at:
https://www.nytimes.com/2009/12/11/business/11food.html ) (last accessed Mar. 7, 2024).

hog production facilities, JBS reduced the number of sows it produced in 2016 despite increased consumer demand. This production restriction had the effect intended by the conspirators: according to JBS's 2016 annual report, "pork prices were 18% higher year on year at the end of 2016, on the back of increased demand and output restrictions."[54]

### 8. Co-Conspirator Indiana Packers

190.    Co-Conspirator Indiana Packers is a private company with limited information available to the public regarding its production statistics. Nevertheless, in 2012, Indiana Packers indicated that it expected to reduce the number of hogs or pounds of pork processed at its facilities ostensibly because of high corn prices, which was merely a pretext.

191.    Like the Packer/Processor Defendants, Indiana Packers' interactions with its competitors occurred at the highest levels of the company.

### B. Timeline of the Conspiracy

192.    As set forth above, each of these supply reductions during the conspiracy was a departure from the Packer/Processor Defendants' and Co-Conspirators' market behavior prior to the start of the Conspiracy Period. These supply restrictions involved a significant share of the Packer/Processor Defendants' and Co-Conspirators' annual production, and they were in contravention of their individual economic self-interest. These unprecedented supply restriction strategies were a part of a coordinated antitrust conspiracy by competitors to reduce and restrict supply, to artificially, fix, raise, and stabilize the price of pork. While the Packer/Processor Defendants went to great lengths to maintain the secrecy of their unlawful anticompetitive agreements, they disclosed certain of their supply restriction efforts in public earnings calls and other sources. As with their use of Agri Stats, each of the Packer/Processor Defendants and Co-

---

[54] JBS Annual Sustainability Report, 2016.

Conspirators exploited these public statements to communicate their planned supply restrictions to their competitors in furtherance of the conspiracy and couched the public disclosures in pretext so as to conceal what was really occurring.

193.    As early as January 2008, the CEOs and other senior executives of each of the Defendants recognized that, as a result of expansion and productivity increases in their operations, there was an oversupply of pork. However, the substantial supply reductions that were necessary to return the industry to the Defendants' desired level of profitability were against the individual self-interest of each Defendant. In the absence of an agreement between all Defendants to reduce supply, it did not make financial sense for any company to reduce its own supply levels. Accordingly, Defendants began to use their positions on the AMI and the Twenty-First Century Pork Club ("Pork Club") to coordinate supply cuts that could not be achieved in the absence of collusion. Defendants and Co-Conspirators affirmatively shaped the rules of these organizations to conceal the way they were using them to coordinate the supply reductions (and thus hide the existence of the conspiracy).

194.    In November 2008, Jeff Ettinger, Hormel's CEO, confirmed during an earnings call that he expected to see a 3% reduction in overall pork supply in 2009.[55] Also in November 2008, Dick Bond, President and CEO of Tyson Foods, stated that there were likely to be fewer hogs in 2009.[56]

195.    During Hormel's first quarter earnings call in January 2009, its CEO once again communicated that he expected pork supply to decrease in 2009. Hormel's CFO confirmed

---

[55] Q4 2008 Hormel Foods Corporation Earnings Call Transcript (Nov. 25, 2008).

[56] Q4 2008 Tyson Foods, Inc. Earnings Conference Call (Nov. 10, 2008).

publicly that Hormel would "certainly look for opportunities particularly in January where we could reduce the numbers that we had going through."[57]

196.    As another example, in January 2009, Tyson stated that the capacity utilization of its pork processing plants was 90% for the quarter, down from the previous year's rate of 94%.[58] This indicated that Tyson was reducing the amount of pork that it processed in its plants. Tyson stated that it would "continue to watch forward hog supplies and make adjustments accordingly."[59]

197.    In February 2009, Smithfield said that it would close six pork processing plants.

198.    In early 2009, pork industry participants continued to note the need to reduce supply. For instance, in February 2009, Greenwood of AgStar, publicly called on U.S. pork producers to follow the lead of the broiler and dairy industries by reducing production, noting that the U.S. pork industry needed to reduce the sow herd by 5–10%, which at the low end would mean reducing the nation's sow herd by 300,000 sows.[60] Notably, Greenwood's efforts to publicly encourage pork producers to decrease supply made no mention of the financial pressure that AgStar was putting on companies to comply with Greenwood's advice.

199.    Similarly, in February 2009, Hormel addressed whether slaughter would be cut back, by stating "you look at the opportunity to reduce your production numbers and we've certainly ... look[ed] for opportunities ... where we could reduce the numbers that we had going through ...." Hormel emphasized that "if there were free market hogs that normally we would be bidding on, we're not looking to take them in...."[61]

---

[57] Q1 2009 Hormel Foods Corporation Earnings Call Transcript (Feb. 19, 2009).

[58] Q1 2009 Tyson Foods, Inc. Earnings Conference Call (Jan. 26, 2009).

[59] *Id.*

[60] Dale Miller, "Industry's Stimulus Package – Cull Sows," *National Hog Farmer,* (Mar 15, 2009).

[61] Q1 2009 Hormel Foods Corporation Earnings Conference Call (Feb. 19, 2009).

200.     During this early phase of the conspiracy, the Defendants recognized that more coordination was necessary between them to decrease supply at a sufficient level. Recognizing that the many trade associations and industry groups that each Defendant belonged to provided the infrastructure for such coordination, Defendants began to use their frequent meetings to implement their collusive supply reduction.

201.     In an effort to provide additional assurances to his competitors, Pope (Co-Conspirator Smithfield's CEO) continued to speak publicly about the progress of Smithfield's efforts to reduce supply. On May 13, 2009, he reportedly stated at an industry conference attended by other pork industry executives that:

> In terms of chronology of how I say we proactively managed this business, in February of last year--February of '08, not February of '09—we made the decision with the over-supply of livestock to take the leadership position and start reducing our sow herds because we saw the overproduction and the oversupplies of the hogs into the market, which was driving our hog market down. We started a reduction of 50,000 sows and 1 million of our 18 million pigs, we started taking out of the system.[62]

202.     On June 16, 2009, Pope (Smithfield's CEO) stated during an earnings call that Smithfield's current cuts were not enough, that more were needed to "fix" the hog industry, and that "[s]omebody else has got to do something:"

> One of the things that we're doing is managing what you can do and the 3% relates to one of our operations and it's our—I'll tell you, it's our Texas operation that sells pigs to Seaboard. Seaboard knows that. ... That 3%, let me say that, our 3% will not fix the hog industry. That part I'm confident of. Somebody else has got to do something. We cut 13%. The first 10% didn't fix it. I don't think us going from 10 to 13 is going to fix the hog business.[63]

---

[62] Smithfield Foods at BMO Capital Markets Agriculture, Protein & Fertilizer Conference – Final (May 13, 2009) (emphasis added).

[63] Q4 2009 Smithfield Foods Earnings Conference Call (June 16, 2009).

203.    During the same call, when asked to describe his expectations for whether the rest of the industry would "liquidate" (*i.e.*, cut production), Smithfield's CEO Pope described how at the 2009 Pork Expo in early June 2009, cutting supply was the "key subject of the discussion of every producer," adding that such supply reduction is "something [that] has got to happen. And so that's very positive."[64]

204.    Tyson was the next company to publicly announce a major sow liquidation. In May 2009, Tyson stated that its capacity utilization rate for its pork processing plants for the quarter was 87% down from the previous year's rate.[65] Tyson described pork "supplies coming down" and that "the worldwide suppliers of pork are still down."[66]

205.    More significantly (and following Smithfield's major announcement in June), Tyson announced on July 15, 2009, that it was liquidating 20,000 sows, over 28% of its herd. In particular, Tyson sold five farms and sent the sows to slaughter. Tyson's 2019 10-K report further stated: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal year 2009)."[67]

206.    In August 2009, Tyson Foods, Inc.'s Chief Operating Officer, James Lochner, confirmed on an earnings call:

> Hog supplies will be down in Q4 year over year but still adequate. We do expect to see liquidation accelerate and pork production decrease into 2010 and beyond to improve producer profitability. We will continue to watch forward hog supplies to drive more exports, monitor demand, focus on cost, mix, and pricing to generate revenue...Looking forward in the pork segment we will see a gradual decline in hog

---

[64] *Id.*

[65] Q2 2009 Tyson Foods, Inc. Earnings Conference Call (May 4, 2009).

[66] *Id.*

[67] Tyson Foods, Inc. 10-K Annual Report, at 20 (2009).

supplies to the first half of our fiscal year with additional year over year declines into Q3 and Q4."[68]

207.    These statements were echoed in Tyson's 2009 10K Report, which again noted that: "We expect to see a gradual decline in hog supplies through the first half of fiscal 2010, which will accelerate into the second half of fiscal 2010, resulting in industry slaughter slightly higher than 2007 (or roughly 4% less than fiscal 2009)."[69]

208.    These efforts by Defendants and Co-Conspirators provided the assurances that other processors needed to reduce supply as well, even though processors would have been better off financially by maintaining their production levels in anticipation of the price impact from the Smithfield, Hormel, and Tyson supply cuts. In July 2009, Co-Conspirator Smithfield's CEO Larry Pope went on to note in the company's annual report that: "I strongly believe that the hog production industry has reached an inflection point where, due to deep and extended losses, liquidation is now a recognized reality by all in the industry. To date, Smithfield has already reduced the size of its U.S. herd by two million market hogs annually, and we are initiating a further reduction of 3% of our U.S. sow herd, effective immediately. This reduction, combined with the additional cuts by our fellow producers should shrink supply to a point where the industry can return to profitability. This liquidation is long overdue."

209.    On an August 2009 earnings call, Wesley Mendonça Batista, CEO of Co-Conspirator JBS, stated that pork producers had begun hog liquidation. He reportedly stated: "[W]e are seeing the start, we are seeing some increase in—not increase, we are seeing some more [hog] liquidation. So we think we will continue to see the margin in the processing side strong this whole

---

[68] Q3 2009 Tyson Foods, Inc. Earnings Conference Call (August 3, 2009).

[69] *See* Tyson 2009 10K Report, at 20.

year. But in the pork producers, it will be a real challenge for them, producers for, in the next quarters."[70]

210.     The other Packer/Processor Defendants and Co-Conspirators agreed to or accepted Smithfield's offer or exhortation for the "industry" to cut production and to announce those cuts to other producers. During 2009, Triumph reported that it reduced the number of sows that it had from 396,000 to 371,500. Notably, Triumph and Seaboard had a longstanding marketing agreement in which hogs processed by Triumph were marketed by Seaboard.[71] Thus, the reported reduction in supply of sows raised by Triumph would result in a reduction in the amount of pork that was sold by Seaboard.

211.     In September 2009, Smithfield's CEO stated that he had conversations with "sizable large producers" and that they would be doing some liquidation:

> We can't solve the problem. But the answer to that is yes, I have had conversations with several sizable, more than sizable large producers, in fact very large producers, and I would tell you they are doing some liquidation. But again, I don't think they can solve it.
>
> I think this industry has got to solve it collectively. I do believe everyone is now looking, and when I'm talking to people who are financially extremely strong and they are cutting back, that's got to be a statement about those people who are not financially strong. But the answer is, yes, there are others cutting back. We're not the only one.[72]

212.     On October 22, 2009, Seaboard's CEO, Rod Brenneman, testified in front of the House Committee on Agriculture, Subcommittee on Livestock, Dairy and Poultry. In his testimony, Mr. Brenneman publicly requested that Congress work with the Department of

---

[70] Q2 2008 JBS Earnings Conference Call (Aug. 13, 2009).

[71] According to Seaboard Corporation's 2010 Form 10-K, filed with the Securities and Exchange Commission, "Seaboard's Pork Division has an agreement with a similar size pork processor, Triumph Foods LLC (Triumph), to market substantially all the pork products produced at Triumph's plant in St. Joseph, Missouri."

[72] Event Brief of Q1 2010 Smithfield Foods Earnings Conference Call (Sept. 2009) (emphasis added).

Agriculture to make "additional purchases of pork for various federal food programs with a maximum emphasis on purchasing meat from sows with the objective to reduce breeding stock to reduce hog numbers." Mr. Brenneman also asked Congress to work with the U.S. Trade Representative "to open export markets to U.S. pork, particularly China."

213.    In December 2009, the CEO of Smithfield confirmed that it had done its "fair share" to cut supply and communicated that others needed to continue cutting supply to "put this industry back in balance:"

> We continue to take a leadership role there and we have continued to take sow reductions and liquidation in our own herds and all of that has essentially been completed from Smithfield's side, so I think we've certainly done more than our fair share in terms of what this industry needs... I can tell you that

> I know in the east, its [sic] been pretty public about some of the producers on the east coast that have been cutting back besides ourselves. We are getting a little more information in the Midwest and I am saying that I have not seen the significant Midwest reduction that would probably be needed to put this industry back in balance.[73]

214.    In a January 2010 article, an industry insider noted that the pork industry still needed a 12% reduction in order to restore the pork industry to profitability, even though sow numbers had already dropped by over 5% in 2009.

215.    During 2010, each of the Packer/Processor Defendants continued its collusive efforts to do just that. For example, in March 2010, when asked about fourth quarter and 2011 volumes for pork, the CEO of Smithfield reportedly indicated that further cuts were still to come:

> Hog volumes for the rest of the fiscal year. That's going to have the impact starting next fiscal year when there is going to be 13,000 less. But I think we'll pick up some of that in our other operations. But I think 8,000 or 9,000 or 10,000 of those a day will disappear from our operations and that represents about 8% of our, 8% of the hogs will be down. That's for also the fresh pork side.[74]

---

[73] Q2 2010 Smithfield Foods Earnings Conference Call – Final (Dec. 10, 2009).

[74] Event Brief of Q3 2010 Smithfield Foods Earnings Conference Call – Final (Mar. 11, 2010).

216.   On March 8, 2010, JBS's CEO mentioned pork producers' reduction in hog supply as a driver of profitability, and he stated that these reductions were resulting in protein shortages:

> [A] combination of reduction in supply for cattle, for hogs and for chicken and in the other hand the improvement and increase in consumption in the emergent markets we are very optimistic about our business, about the margin that we will see a strong demand and this reduction in supply, so we believe that we will see some shortage in protein going forward.[75]

217.   As of March 2010, U.S. pork production was noted to be down 7%, with 6% of the reduction coming from a reduction in slaughter and 1% from lower market weights. The Packer/Processor Defendants and Co-Conspirators also were reported to have increased exports 8% by March 2010, which was expected to lead to higher pork prices.

218.   In May 2010, Tyson stated in its Q2 2010 earnings conference call: "Worldwide protein supplies and US domestic availability are expected to remain below '08 and '09 levels. We have seen good interest in Beef and Pork exports to a variety of global destinations."[76] Similarly, in August 2010, Tyson stated in its earnings call that "Pork supplies in 2011 are anticipated to be below their peak supplies in calendar 2008 and 2009, and most projections show no material changes compared to 2010."[77]

219.   In September 2010, Smithfield stated in a press release that the closure of its Sioux City plant in April 2010 had led to an 11% reduction in its processing rate from the prior year. Smithfield further stated: "Industry wide, slaughter volumes were down 3.5%," and "Lower industry slaughter levels are expected to persist well into the company's second quarter."[93]

---

[75] JBS Q4 2009 Earnings Conference Call (Mar. 8, 2010).

[76] Q2 2010 Tyson Foods, Inc. Earnings Conference Call (May 10, 2010).

[77] Q3 2010 Tyson Foods, Inc. Earnings Conference Call (2010).

Smithfield's quarterly results from that time reflected that the volume reductions "should help stabilize prices at healthier levels than fiscal 2010."[78]

220.    In July 2010, the Pork Checkoff website noted that pork producers had responded to lower prices in 2009 "by reducing the size of the national herd" and "[a]s a result, prices have rebounded."[79]

221.    The Packer/Processor Defendants acknowledged access to information that allowed them to know that the supply of pork would not be increasing. For example, in December 2010, the CEO of Smithfield reportedly stated:

> We certainly compare ourselves to our competitors as best we can. Given the information we think we have public plus what we think we know privately, how many they kill, what their processing levels are and things like to. This is information you may not quite have. And we have been certainly impressed with how our competitors have been able to achieve margins that we have not been able to achieve because our fresh pork competes very competitively with theirs.[80]

222.    As alleged above, Smithfield had access to Competitively-Sensitive Information from its competitors through, among other means, the Agri Stats reports, which allowed it to know confidential supply information from its competitors.

223.    Supply level information regarding competitors allowed Defendants and Co-Conspirators to know that supply would not increase in the future, given the lifecycles of the animals.

224.    In February 2011, Tyson's COO similarly stated:

> I think there's still a widely held belief that our Beef and Pork profitability isn't sustainable. I want to again explain why we don't believe that's true. If we look at

---

[78] *See* Smithfield Foods, Inc. Form 10-Q, at 22 (March 11, 2011).

[79] *See* National Pork Board to meet during National Pork Industry Conference, Pork Checkoff (July 8, 2010), available at https://www.pork.org/news/national-pork-boardmeet-national-pork-industry-conference/.

[80] Event Brief of Q2 2011 Smithfield Foods Earnings Conference Call – Final (Dec. 2010).

supply, current cattle and hog production levels can't change much in 2011 because of the limits of the animal's life cycle.[81]

225.    In the face of ever-increasing margins, when asked whether the type of profits would continue, in a March 2011 earnings call, Larry Pope and Robert (Bo) Manly of Smithfield confirmed to their competitors that it would not increase capacity, even in the face of the increased profitability:

> LARRY POPE: We closed last night at nearly $64 for hogs. Yet we are projecting over the next 90 days we will be up another 20% from that. I mean those are big numbers to get the meat prices in the retail and food service case to cover that....

> HEATHER JONES [industry analyst]: So you are just striking a note of caution because you know it can't stay this way indefinitely; but it's not that you foresee this reversion to that norm over the near term?

> BO MANLY: I don't see it on the horizon, on the foreseeable horizon. We are still going to have -- should have good margins, but I can't believe -- LARRY POPE: [...] Heather, we're sitting here today, we're halfway closing in on halfway through our fourth quarter, and we've had very good margins through February and March through today. I mean, we've got double-digit margins today.

> BO MANLY: It will correct itself over the long run because this type of return on investment would attract capital, would attract expansion, and we'd kill more pigs and drive the margins lower, so it'll either happen by itself or someone's going to build a plant.

> HEATHER JONES [industry analyst]: All right, okay. Thank you.

> LARRY POPE: You get two-year visibility on that, though. You get to know when somebody's building a plant because they've got to file for a permit and they have actually got to build the thing. [...] And by the way, we're not going to build a new plant to expand capacity.[82]

226.    While hog production expanded in the years following Defendants' cuts, Larry Pope's assertions that capacity increases would be slow to arrive proved correct, as Defendants

---

[81] Q1 2011 Tyson Foods Earning Conference Call – Final (Feb 4, 2011).

[82] Event Brief of Q3 2011 Smithfield Foods Earnings Conference Call – Final (Mar. 2011).

did not increase slaughter capacity until the 2017–2018 period.[83] As alleged herein, following Defendants' major cuts, U.S. pork production fell well below its peak levels for several years. Total production in 2014 was muted somewhat by the PEDv outbreak. While Defendants did not cause the PEDv outbreak, their cuts to production in the preceding years magnified its impact. Following PEDv, pork production continued along the same trend as it did from 2009–2013, before sharply increasing in 2018–2019 with the opening of several new packing facilities.[84]

227.    In March 2012, Co-Conspirator Smithfield's VP of Finance and Chief Accounting Officer stated, at an analyst conference widely-attended by his competitors, that no one in the industry would be "real excited about adding capacity"[85] when the losses of 24 to 36 months ago were considered:

> Nonetheless, you see some pretty significant fluctuations. Just two weeks ago, I think we had -- there were rumors the Chinese buying corn, and boom, all of a sudden the corn market is up $0.20, $0.30. So there is some volatility there. And what I would tell you is that keeps a lid on pork production. The pork guys in the United States have not forgotten 24 or 36 months ago when there were significant losses in the industry. There is no one going to be real excited about adding capacity, adding sows at a time when we've got such volatility.[86]

---

[83] *Id.*

[84] Steve Meyer, an economist with Kerns & Associates, explained that the existing facilities could have processed more pork. In June 2018 Meyer stated that the industry has "enough capacity to handle it, but there are more hogs out there than folks have planned to process at this [sic] plants. ... If the plants aren't ready, that put more hogs on the market." J. Deyoung, "Pork packing capacity faces delays to growth," Iowa Farmer Today, June 15, 2018, https://www.agupdate.com/iowafarmertoday/news/livestock/pork-packing-capacity-faces-delays-togrowth/article_ f86fde7e-64dc-11e8-b288-475ac8083072 html. In other words, Defendants were not processing as much pork as they could, and they were instead concerned about uncontracted hogs lowering prices for pork.

[85] Smithfield Foods at Barclays Bank High Yield Bond and Syndicated Loan Conference – Final (Mar. 26, 2012).

[86] *Id.*

228.    By May 2012, industry observers were noting that the reductions in slaughter capacity meant the Packer/Processor Defendants and Co-Conspirators may not have enough capacity to slaughter expected hog levels by the fall.

229.    At the National Pork Board conference held in Savannah, GA on June 19–22, 2012, presenters and participants continued to discuss the need to reduce hog supply.

230.    On May 15, 2013, Co-Conspirator JBS's CEO continued to demonstrate JBS's ability to constrain the pork market. During a quarterly earnings call, he stated: "[i]n pork, given some restrictions in supply we have been able to pass price through the system and we are seeing good margins in our pork business.... So, this is a clear sign that we have been able to pass price increase in chicken and pork and not in the same extent with beef."[87]

231.    In September 2013, Joe Szaloky, Vice President of Procurement and Business Development for Smithfield, confirmed the company's intention to maintain its sow number, not adding any more.[88]

232.    In December 2013, Robert Manly of Co-Conspirator Smithfield emphasized that coordinated industry action was necessary to "balance supply and demand:"

> So I think you really need to look at the overall industry balance of supply and demand to be able to determine, and the industry move prices up and collectively as a group. We've got limited ability to do it ourselves if the rest of the industry doesn't follow, but the consumer tends to be willing to pay proportionately higher values for their pork meat when small increments of supply are withdrawn from the marketplace.[89]

---

[87] Q1 2014 JBS Earning Conference Call (May 15, 2014).

[88] Betsy Freese, *Pork Powerhouse 2013: Disease Hits, Growth Continues*, Successful Farming (Sept. 29, 2013), *available at* https://www.agriculture.com/livestock/hogs/pk-powerhouses-2013-disease-hits-growth_283-ar34203.

[89] Q2 2014 Smithfield Foods Earnings Conference Call (December 23, 2013).

233.     The Packer/Processor Defendants and Co-Conspirators further refused to increase their capacity and gain market share from each other, even when market fundamentals and economics dictated otherwise. For example, during the 2014 PEDv epidemic, which caused industry supply disruptions, Eric Haman, Clemens Food Group's communication manager, stated the disease "had a very minimal impact on our hog flow, especially when you compare it to others in the industry." He stated: "That's one of the many benefits of raising hogs in Pennsylvania, since we have a much lower density of pigs than other states, which decreases the risk of (a virus) like this."[90] Yet, in furtherance of their conspiracy, Clemens did not take advantage of having few PEDv infected pigs. Instead of attempting to increase its market share, it stayed the course with its fellow competitors.

234.     Defendants and Co-Conspirators' conspiracy yielded substantial profits by 2014. In October 2014, the Pork Powerhouses report noted that "Joe Szaloky, vice president of business development and planning for Smithfield, is confident about profit during the next year, but 'concerned 2016 could be "problematic" if the industry expands too fast. The PED virus trimmed supply, but higher market weights helped compensate.'"[91]

235.     In early 2015, Pig International noted the continuing problem of available daily slaughter capacity limiting the ability to significantly expand pork production. Specifically, pork producers rushed to sign contracts with Packer/Processor Defendants and Co-Conspirators that would protect them if production exceeded slaughter capacity as some feared.

---

[90] Kyle Bagentose, *Pig Virus Has Ability To Affect Local Herds*, Bucks County Courier Times (May 4, 2014).

[91] Freese, Betsy, *Pork Powerhouses 2014: High on the Hog* (Sep. 30, 2014).

236.    The conspiracy—in which Defendants communicated extensively about their plans to reduce supply and exchanged Competitively-Sensitive Information through Agri-Stats—also fostered an environment in which Defendants communicated extensively with each other about their pricing. Accordingly, as detailed in this Complaint, throughout the conspiracy, the collusion on supply also allowed Defendants to coordinate their pricing, and Defendants engaged in extensive communications about their supply cuts, slaughter levels, and pricing of pork.

## XI.    Abnormal pricing during the conspiracy demonstrates the success of the conspiracy.

237.    Early in the Conspiracy Period, beginning in approximately 2009, the pork industry showed abnormal price movements for both hogs and pork, *i.e.*, increases in prices unexplained by increases in costs. All of these pricing measurements show a significant break between pricing prior to 2009, and pricing during and after 2009, supporting the plausibility of a conspiracy to increase prices of pork. These abnormal pricing movements can be measured in a number of ways, including: (i) the average live hog price, (ii) the pork cut-out composite price, (iii) the Packer/Processor Defendants and Co-Conspirators' margins during the conspiracy; (iv) and the Packer/Processor Defendants and Co-Conspirators' revenues before and during the conspiracy. Each of these measures supports Plaintiffs' allegations that Defendants and Co-Conspirators conspired to restrict production and otherwise acted in a concerted manner to artificially increase pork prices in the U.S. Defendants understood that pork prices could not be kept successfully at an artificially-high level without all Defendants committing to significant changes in production.

**A. The average hog wholesale price experienced an unprecedented increase beginning in 2009.**

238.    According to aggregate prices published by the USDA, prices for pork products were less than $1.40/lb from 2000 to 2009. Thereafter, prices increased dramatically, rising to more than $1.80/lb in 2014, and never dropping below $1.40/lb again.

239.    As Figure 11 below shows, publicly available data also demonstrates that Packer/Processor Defendants and Co-Conspirators' earnings increased steadily over the years 2009 to 2016, with a slight decline in 2017, demonstrating an unusual increase in profits resistant to changes in price during the conspiracy. These substantial profit increases bear the hallmarks of coordinated efforts to constrain supply below demand.

**Figure 11: Integrator Earnings per Retail Weight, 2000-2017**



**B. The pork cut-out composite price experienced a dramatic increase in 2009 and continuing throughout the Conspiracy Period**

240.    During the Conspiracy Period, various pork products saw substantial increases in prices, compared with before the Conspiracy Period. As shown in Figure 12 below, using one

particular price for pork—the lean hog composite price—a pricing analysis shows that the average price index increased significantly during the Conspiracy Period.

**Figure 12: Lean Hog Composite Price, 2000-2019**



241.    The increase in prices resulted in massive profits for Defendants.

**C. The Packer/Processor Defendants and Co-Conspirators' revenues increased beginning in 2009, even taking into account their specific costs.**

242.    An examination of the spread between pork revenue and pork-related costs (*i.e.*, costs of goods sold plus operating costs) for two of the largest Packer/Processor Defendants and Co-Conspirators (Tyson and Smithfield)—which can be used as a proxy for measuring the spread between the Packer/Processor Defendants' price of wholesale pork and hog costs—confirms a divergence between revenue and costs at the approximate start of the conspiracy. This divergence in revenue and costs starting in 2009 reflects the beginning of abnormal pricing in 2009.

243.     Specifically, such an examination shows a break in Tyson's revenues and costs around the start of the conspiracy: from 2001 to 2009, Tyson's average profit on pork was 3.7 percent; from 2010 to 2017, Tyson's average profit on pork jumped to 8.7 percent.

244.     The same analysis for Smithfield shows a similar break in revenues and costs beginning at the start of the conspiracy: from 2004 to 2009, Smithfield's average profit on pork was 3.2 percent; from 2010 to 2016, Smithfield's average profit on pork increased to 6.3 percent.

245.     These analyses of the spread between costs and prices relate solely to each Packer/Processor Defendant's pork segment, and thus confirms that rising costs in pork production do not explain the increases in price seen during the conspiracy.

## XII.     The Conspiracy was effective in increasing the price of pork sold to Plaintiffs and others in the United States.

246.     As explained below, the conspiracy was effective in artificially and substantially elevating the price of pork sold to Plaintiffs and others in the United States.

247.     Pork products are commodities; pork products sold by competitors have no meaningful difference and are thus interchangeable. As such price is driven by the economic fundamentals of supply and demand. In the words of Tyson's COO during a 2010 earnings call, "As you know decreased supply should be favorable to pricing."

248.     By reducing, stabilizing, and maintaining the supply of pork, even in the face of increasing demand, Defendants' common goal was to increase the price of pork and their margins. In 2012 the CEO of Tyson reported that these efforts were successful, stating: "Well, what we've seen happen, and it's about evolving over time, is beef prices have inflated from a reduced supply, increased global demand, same with pork prices inflating from reduced supply and global demand, putting less domestic product on the market."

249.    The volume of U.S. commerce in the pork industry is enormous. Total annual pork sales in the United States exceeded $20 billion for much of the Conspiracy Period. Each of the Packer/Processor Defendant's and Co-Conspirators' annual sales of pork products is also very large. For example, in 2016, Smithfield reported $3.7 billion of fresh pork sales, and an additional $5 billion in packaged pork product sales. That same year, Tyson reported $4.9 billion in pork sales. With such enormous revenues, the ability to stabilize or increase the margin even in small amounts has an enormous impact on profits, resulting in substantial damages to Plaintiffs.

250.    The Bureau of Labor Statistics ("BLS") maintains a series of Producer Price Indexes ("PPI") which measure the changes in wholesale prices for pork products paid by Plaintiffs. The PPI for Pork (Processed or Cured – Not Canned/Made into Sausage) shows a marked increase beginning in 2009 and continuing through 2017:

**Figure 13: PPI for Pork (Processed or Cured – Not Canned/Made into Sausage, 1995–2017)**



251.    The BLS also tracks commonly purchased products in its Consumer Price Index ("CPI"). From the end of 2009 to the end of 2020, the CPI for all food products increased approximately 18.0 percent.[107] Over the same period, prices for pork—including bacon, ham, and other pork products—have increased substantially during the conspiracy. The graphs and information below provide examples showing how pork prices have increased at substantially higher rates, since the conspiracy began in 2009, than prices for food products as measured by the Bureau of Labor Statistics. The information that follows is a proxy for the artificially higher prices that Plaintiffs paid for pork because of and during the conspiracy.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

252.    For example, the price of a pound of bacon has increased from $3.57 at the end of 2009 to $5.83 at the end of 2017, an increase of 63.3 percent. Figure 14 below shows the extent that prices for a pound of bacon increased dramatically during the Conspiracy Period compared to general food prices.[92] The increases in the prices of pork far out-paced the growth in prices for other food products during the Conspiracy Period.

**Figure 14: Price Index for Bacon and Food, 1998–2020**



253.    Similarly, the CPI for other pork products, excluding canned ham and luncheon slices, show a marked increase during the conspiracy, moving from $2.05 per pound at the end of 2009 to $2.99 at the end of 2020 (approximately 45.9 percent).[93]

---

[92] U.S. Bureau of Labor Statistics, Average Price: Bacon, Sliced (Cost per Pound/453.6 Grams) in U.S. City Average [APU0000704111], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0000704111, Nov. 30, 2021.

[93] U.S. Bureau of Labor Statistics, Average Price: All Other Pork (Excluding Canned Ham and Luncheon Slices) (Cost per Pound/453.6 Grams) in U.S. City Average [APU0000FD4101], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0000FD4101, Nov. 30, 2021.

254.     Further, the CPI for another commonly purchased consumer item—ham—shows an increase from $2.13 in December of 2009 to $3.53 in January of 2021 (or 65.7 percent).[94]

**XIII.   Plaintiffs' claims are timely.**

### A. American Pipe tolling

255.     Plaintiffs' claims have been brought within the applicable statute of limitations period.

256.     Plaintiffs, having purchased pork directly and pursuant to assignments with Assignors that made direct purchases on behalf of Plaintiffs, from one or more Defendants or Co-Conspirators, were members of the putative direct-purchaser class first alleged in *Maplevale Farms, Inc. v. Agri Stats, Inc. et al.*, Case No. 18-cv-1803 (D. Minn.), filed in the U.S. District Court for the District of Minnesota on June 29, 2018. That class action has now been centralized with the other cases in *In re Pork Antitrust Litigation*, MDL 2998 and Civil Case No. 18-1776 (D. Minn.). Plaintiffs had neither actual nor constructive knowledge of the facts constituting their claims for relief, and Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before its claims were tolled by the filing of the *Maplevale* complaint on June 29, 2018.

257.     By virtue of the filing of the *Maplevale* complaint, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs have as a result of the unlawful combination and conspiracy alleged in this Complaint beginning at least as early as June 29, 2018, under *American Pipe & Construction Co. v. Utah*, 414

---

[94] U.S. Bureau of Labor Statistics, Average Price: All Ham (Excluding Canned Ham and Luncheon Slices) (Cost per Pound/453.6 Grams) in the Midwest Census Region - Urban [APU0200FD2101], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/APU0200FD2101, Nov. 30, 2021.

U.S. 538 (1974), and related authorities, and remain tolled during the pendency of the direct purchaser class action asserted against non-settling Defendants.

### B. Fraudulent Concealment

258.     During the Conspiracy Period, and as alleged in detail in this Complaint, Defendants and Co-Conspirators both conducted their conspiracy in secret and created pretexts to avoid detection of their unlawful conduct. This concealing conduct included coordinating their supply plans at or incident to trade group meetings and events in order to give their collusive meetings the appearance of legitimacy; communicating through third parties or through backchannels; avoiding references to the conspiracy in their internal communications and describing information received directly from competitors as "rumors" to avoid naming their sources in writing; communicating with each other by telephone to avoid written records of what they said and limiting knowledge of the conspiracy to only an inner circle of senior executives; deleting evidence of the conspiracy and instructing others to do the same, so that there would not be a paper trail of their unlawful scheme; coordinating between family members who worked for different Defendants; and by providing deceptive and pretextual statements to their customers and to the public in justifying supply cuts and price increases that were intended to conceal–and did in fact conceal–that these actions were the result of collusion

259.     During the Conspiracy Period, Packer/Processor Defendants and Co-Conspirators publicly and pretextually claimed that increases in their pork production input costs or other seemingly plausible reasons were responsible for increased pork prices when, in fact, they were not. This created the illusion that the price of pork that they sold to Plaintiffs was competitive, when, in fact, it was not because their pork prices were the result of the conspiracy. As just one example, producers claimed that decreased supply and higher prices were caused by the H1N1 outbreak.

260.    As another example, in 2012, Tyson's CEO insisted publicly that Tyson Foods "need[ed] to get our pricing improvements in order to get paid for those higher raw materials."[95] His statements indicate at the time that he understood customers would—in his words—"understand that these higher grain prices are going to require higher prices."[96]

261.    Similarly, Hormel used supply information from Smithfield to justify price increases on its pork products.

262.    The PEDv scare was also a pretext for higher prices due to allegedly short supply.

263.    Defendants also communicated in secret to coordinate their supply reductions and price increases, including by sending to competitors their future supply and pricing plans and instructing colleagues to conceal or delete evidence of their unlawful actions, or to not forward such information beyond a small group of senior executives. Some of these illicit communications were conducted using employees' non-work, personal email accounts with Gmail, AOL, or Hotmail.

264.    On November 9, 2012, senior-most executives from Defendants and Co-Conspirators, including Cargill, Tyson, Smithfield, and JBS, met in Chicago. Within two months of the meeting, Defendants began cutting back their kill rates, and reported these reductions to the competition.

265.    In 2017, when Clemens added a new plant, it made sure to inform its competitors of the anticipated capacity, schedule, and impact of this new plant in an effort to avoid retribution from the other conspirators for adding capacity.

---

[95] Q4 2011 Tyson Earnings Conference Call (November 21, 2011).

[96] Q4 2012 Tyson Earnings Conference Call (November 19, 2012).

266.    The December 8, 2017, filing of a direct purchaser complaint against Agri Stats in *Affiliated Foods, Inc. v. Claxton Poultry Farms, Inc.*, No: 1:17-cv-08850 (N.D. Ill.), and subsequent Complaints in *In re Broilers*, presented in further detail the confidential services that Agri Stats provides to its clients in the Broiler industry.

267.    The Bloomberg Businessweek article disclosing the pork industry's use of Agri Stats, the *Affiliated Foods* Complaint, and subsequent public filings in *In re Broilers*, collectively disclosed the likelihood that the pork industry was using Agri Stats to share confidential industry information that could facilitate an anticompetitive conspiracy.

268.    Until that time, the combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including but not limited to planning and conducting private meetings during which anticompetitive conduct was shielded from public view; communications between Defendants by the use of the telephone to prevent the existence of written records; limiting any explicit reference to competitor pricing or supply restraint communications on documents; communicating competitively sensitive data to one another through Agri Stats' "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret; making misleading statements to investors and the public designed to conceal their wrongful conduct, including about the nature of the information shared with and among competitors through Agri Stats; and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).

269.    Agri Stats is a secretive company, and repeatedly made affirmative statements about the public's lack of access to and information about its services. For example, in 2009, the President of Agri Stats, Blair Snyder, explained:

> Agri Stats has always been kind of a quiet company. <u>There's not a whole lot of</u>
> <u>people that know a lot about us obviously due to confidentiality that we try to</u>

protect. <u>We don't advertise. We don't talk about what we do.</u> It's always kind of <u>just in the background,</u> and really our specialty is working directly with companies about their opportunities and so forth.[97]

270.    But Agri Stats did not just conceal the conspiracy alleged herein by being a "quiet company" that did not advertise or "talk about what we do" in public—Agri Stats also engaged in numerous affirmative acts to conceal the alleged conspiracy during the Conspiracy Period. Specifically, Agri Stats made repeated false or misleading statements about the true nature of the information that it provided to the Defendants, all of which served to exclude suspicion and prevent discovery of Defendants' illegal scheme.

271.    For example, in the same 2009 presentation discussed above about the "quiet" and secretive nature of Agri Stats, Mr. Snyder also emphasized that he was not at liberty to discuss "bottom line numbers" (a company's net earnings), and declined to display those numbers publicly, stating: "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information." However, while affirmatively asserting that it was unable to share this information publicly due to "confidentiality" concerns, Agri Stats was at the same time providing producers with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements thus acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general.

272.    These statements acted to conceal the true detail and nature of the Agri Stats reports from Plaintiffs and the public in general. Agri Stats repeatedly asserted in public that its reports did not disclose or identify any individual participant's data to any other participant and that each producer's data were kept confidential: "The fact that we collect a tremendous amount of data, and you'll see that throughout the presentation as we talk. I've got some demo examples of what we

---

[97] Sanderson Farms Investor Day (Oct. 2009) (emphasis added).

do. Obviously, no individual companies are identified or talked about'; "We'll talk about comparison of data in a little bit, but the main thing is that we want to preserve the confidentiality of individual companies, so you'll hear that word a lot throughout the presentation. I apologize but that's what we're all about"; and "The confidentiality, only your company is underlined; you don't know who anybody else is."

273.    Contrary to these public statements, in private, Agri Stats knowingly and intentionally shared each Packer/Processor Defendant's and Co-Conspirator's Competitively-Sensitive Information with the others and the participants, including the Defendants, were able to identify individual firm information in the Agri Stats reports.

274.    Defendants' affirmative acts of concealment also included pretextual explanations for the industry's stability and improved profitability. For example, in June 2012, Larry Pope, Smithfield CEO, attributed his expectation for improved profitability to other reasons such as "good programs with our retailers" and "lower grain costs":

> KEN ZASLOW: What evidence do you have to actually give you some confidence that fresh pork margins will improve sequentially throughout the year?
>
> LARRY POPE: Strong exports, $71 hog today, good programs with our retailers, and lower grain cost in the future and a futures market that says the hog market's going to be fine. I guess beyond that, you've got chicken and beef that are going to be down significantly.
>
> BO MANLY: And I think there is also some optimism that the US consumer may have some greater disposable income from less gasoline prices and improvement in the economy.[114]

275.    Plaintiffs' claims are timely because, as alleged above, overt actions by Defendants and Co-Conspirators in furtherance of the conspiracy occurred after June 28, 2014 and continued until at least June 28, 2018, if not later, including, without limitation: (a) Defendants and Co-Conspirators unlawfully coordinated to restrict pork production, including, without limitation, using the Agri Stats reports to exchange Competitively-Sensitive Information with each other to

monitor and enforce the conspiracy in 2015, 2016, 2017 and 2018 (if not later); (b) Clemens did not attempt to take advantage of the 2014 PEDv epidemic by increasing market share, although its hogs were largely unaffected by the epidemic and, had it acted rationally, it would have increased production to increase its market share for the year; (c) after it acquired Cargill's pork enterprise in approximately October 2015, JBS opted to decrease supply despite increased consumer demand; and/or (d) in 2015, 2016, 2017 and 2018, Packer/Processor Defendants and Co-Conspirators coordinated in the export of pork.

276.    Each of the foregoing overt acts was a new and independent act in furtherance of the conspiracy and not merely a reaffirmation of a previous act.

277.    Each of the foregoing overt acts, or one or more of them in combination, inflicted new and accumulating injury on Plaintiffs.

278.    Defendants' and Co-Conspirators' parallel conduct as alleged above, including their coordinated restriction of the domestic pork supply, would not have occurred in 2015, 2016, 2017 and 2018 (or later) had the conspiracy been disbanded, but it was not.

279.    "Plus factors" supporting the existence of the conspiracy were still present in 2015, 2016, 2017 and 2018, if not later, including, without limitation, pork remained a commodity product with inelastic demand; the Packer/Processor Defendants and Co-Conspirators wielded substantial market power because of their high collective market share and industry concentration; there remained barriers to other producers entering the domestic market for the production of pork; and/or trade group meetings and events occurred that provided Defendants and Co-Conspirators with the opportunity to conspire, which they did.

280.    Defendants and Co-Conspirators intended that their affirmative acts of concealment to conceal the existence of their unlawful conspiracy from Plaintiffs, and Plaintiffs

were unaware, and had no reasonable basis to be aware, of Defendants' and their Co-Conspirators' acts of concealment during the conspiracy or, at a minimum, either before June 28, 2014, or four years before filing their respective original complaints. As a direct result of Defendants' and their Co-Conspirators' affirmative acts of concealment, Plaintiffs did not have actual or constructive knowledge of their claims alleged in this Complaint, or the facts that might reasonably have led Plaintiffs to discover or suspect that they had claims against Defendants and Co-Conspirators prior to June 24, 2014. Before then, Plaintiffs were not aware of facts that would have alerted it (or a reasonably diligent person in Plaintiffs' position) of the need to investigate whether it had the claims alleged in this Complaint.

281.    Plaintiffs' claims are timely because each of them did not know of (and could not have reasonably discovered) the existence of the conspiracy alleged in this Complaint at least four years or more before June 28, 2014, because of Defendants' and Co-Conspirators' active concealment of their conspiracy as alleged herein. Defendants' and their Co-Conspirators' affirmative and fraudulent concealment of their unlawful conspiracy as described in this Complaint tolled the statute of limitations for Plaintiffs' claims.

282.    During the period more than four years before the filing of Plaintiffs' Complaint, including the period before June 28, 2014, Defendants and Co-Conspirators conducted their conspiracy in secret, including communicating in secret in furtherance of the conspiracy at or incident to trade group meetings and events, avoiding references to the conspiracy in their documents, and communicating with each other by telephone to avoid written records. In the context of this case, the Agri Stats reports provided to the Packer/Processor Defendants and Co-Conspirators were the equivalent of competitors (here, the Packer/Processor Defendants and Co-Conspirators) meeting in secret to exchange Competitively-Sensitive Information with each other

in furtherance of their conspiracy. Instead of meeting in secret in a hotel room and using a white board to conspire, the Packer/Processor Defendants and Co-Conspirators, facilitated by Agri Stats, used the non-public Agri Stats reports that they received to exchange, *i.e.*, communicate, with each other in secret their Competitively-Sensitive Information to implement, monitor, and enforce their conspiracy.

283.    Throughout the conspiracy, Plaintiffs engaged in due diligence in seeking to ensure that they were receiving competitive pricing for pork. For example, and without limitation, Plaintiffs used a method of purchasing pork—including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information—that caused them to believe in good faith at the time that they were receiving competitive prices for pork that they purchased from the Packer/Processor Defendants and Co-Conspirators.

284.    By virtue of the fraudulent concealment of their wrongful conduct by each of the Defendants, the running of any statute of limitations has been tolled and suspended with respect to Plaintiffs' claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint.

### XIV.   Plaintiffs' Claims for Relief and Causes of Action

### COUNT I - VIOLATION OF 15 U.S.C. § 1
**(Brought by Plaintiffs against all Defendants)**

285.    The relevant factual allegations set forth above are incorporated into and re-alleged into Count I.

286.    "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," and "the policy unequivocally laid down by the Act is competition." *Northern Pac. Ry. Co. v. United States*, 356

U.S. 1, 4 (1958); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2144 (2021) ("In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources.").

287.    "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential," which "refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731-32 (1988); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victim of the forbidden practices by whomever they may be perpetrated.").

288.    Therefore, the Sherman Act reaches any concerted scheme to affect prices. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (The Sherman Act covers "agreements to raise or lower prices whatever machinery for price-fixing was used."). Its target is any of the "many forms of restraint upon commercial competition" which "tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market." *Apex Hosiery*, 310 U.S. 469, 495, 497 (1940).

289.    Beginning at a time yet to be determined, but at least as early as January 2009, and continuing in force and effect, or both, until at least 2018 (with an effect that continued thereafter), Defendants and their Co-Conspirators engaged in unreasonable restraints of trade and commerce regarding the production and pricing of pork, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, accomplished by various means, with the exact means to be established at trial.

290.    The course, pattern, and practice of conduct described above included, among other things, and without limitation, agreement, understanding and concerted action among

Defendants and Co-Conspirators, the substantial terms and purpose of which included one or more of the following:

(a)     To control and restrict the production and/or sale of pork to Plaintiffs and others in the United States;

(b)     To fix, stabilize, maintain, and/or raise prices of pork sold to Plaintiffs and others in the United States; and/or

(c)     To earn supra-competitive profits on the price of pork sold to Plaintiffs and others in the United States that resulted from Defendants' and Co-Conspirators' collusion.

291.    To formulate and effect the foregoing illegal combination and conspiracy, Defendants and their Co-Conspirators engaged in, among other conduct, one or more of the following overt acts (including those overt acts alleged in this Complaint):

(a)     The agreed to exchange, and did exchange, current and future Competitively-Sensitive Information about pork sold in the United States;

(b)     They agreed to coordinate and allocate, and did coordinate and allocate, production levels of pork produced in the United States; and/or

(c)     They agreed to restrict, and did restrict, the supply of pork in the United States.

292.    Defendants and their Co-Conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in communications to discuss the restriction of pork production in the United States; participating in communications concerning the implementation of and adherence to their conspiracy; issuing statements about their restriction of pork production in accordance with the conspiracy; and/or exchanging Competitively-Sensitive Information on the production, pricing and/or sale of pork in the United States.

293.     As a result of Defendants' and Co-Conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, during the Conspiracy Period:

(a)     Price competition in the sale of pork among Packer/Processor Defendants and Co-Conspirators to Plaintiffs and others in the United States has been restrained, suppressed, and eliminated;

(b)     Prices for pork sold by Packer/Processor Defendants and Co-Conspirators to Plaintiffs and others have been raised, fixed, maintained and/or stabilized at artificially high and supra-competitive levels throughout the United States; and

(c)     Plaintiffs and other direct purchasers of pork produced and sold by Packer/Processor Defendants and Co-Conspirators have been deprived of the benefit of free and open competition.

294.     Plaintiffs have been injured in its business or property by reason of Defendants' and Co-Conspirators' antitrust violations. Plaintiffs' injury as a direct purchaser of pork is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' and their Co-Conspirators' conduct unlawful.

### COUNT 2 - VIOLATION OF THE PACKERS AND STOCKYARD ACT
### (Brought by Plaintiffs against all Defendants except Agri Stats)

295.     The relevant factual allegations set forth above are incorporated into and re-alleged into Count II.

296.     The purpose of the Packers and Stockyard Act ("PSA") is, among other things, to provide for fair trade practices in the sale and marketing of livestock and meat products. The PSA is remedial legislation and should be construed liberally to give effect its purposes. *E.g., Armour and Co. v. United States*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. United States*, 393

F.2d 247, 253 (7th Cir. 1968). The PSA provides for a private right of action for persons injured by a violation of its provisions. 7 U.S.C. § 209.

297.     Each of the Packer/Processor Defendants and each named Co-Conspirator (other than AgStar) is a "packer" as that term is defined in Section 201 of the PSA, 7 U.S.C. § 191, in that each of them are persons engaged in the business of: (a) buying livestock in commerce for purposes of slaughter; (b) manufacturing or preparing meats or meat food products for sale or shipment in commerce; and/or (c) marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

298.     Under Section 202 of the PSA, 7 U.S.C. § 192, it is unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

(c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling

95

prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; and/or

(g) Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d), or (e).

299.    The PSA's enacting regulations contain further restrictions. For example, the regulations limit packers' rights to share pricing information with competitors:

> No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock, prior to, or during the conduct of, his buying operations: (a) Furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers.

9 C.F.R. § 201.69.

300.    The regulations also require that "each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged." 9 C.F.R. § 201.70.

301.    The Competitively-Sensitive Information that the Packer/Processor Defendants and Co-Conspirators privately sent to or received from one another through the Agri Stats reports

is/are an "article" under the PSA. Additionally, because Packer/Processor Defendants and Co-Conspirators buy livestock, including sows, information about their respective purchase volume of sows, and any of the other Competitively-Sensitive Information that they sent, received, communicated or exchanged with each other through the Agri Stats reports is an "article" under the PSA.

302.    As alleged above, the Packer/Processor Defendants and Co-Conspirators sent or received the Competitively-Sensitive Information for the purpose and with the effect of manipulating the price of pork sold to Plaintiffs and others in the United States.

303.    As alleged above, the Packer/Processor Defendants and Co-Conspirators engaged in other conduct, including without limitation, communicating, arranging, or signaling or otherwise coordinating with each other to restrict pork production in the United States to increase, fix, stabilize, and/or maintain the price of pork sold to Plaintiffs and others in the United States.

304.    Even if the actions of each Packer/Processor Defendant or Co-Conspirator to signal or communicate its intentions to restrict pork production were arguably lawful–and based on the allegations in this Complaint they were and are not–this conduct by each of them, in concert, made their restriction of the domestic pork supply unlawful as alleged in this Complaint.

305.    The actions of each Packer/Processor Defendant and named Co-Conspirator (other than AgStar), as set forth above, constitute one or more violations of 7 U.S.C. § 192 and the enacting regulations of the PSA.

306.    Section 308 of the PSA, 7 U.S.C. § 209, provides that if any person subject to the PSA violates any of the provisions of the PSA, then that person shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

Further, this section provides that such liability may be enforced by suit in any District Court of the United States of competent jurisdiction.

307.     The violations of 7 U.S.C. § 192 committed by the Packer/Processor Defendants and each named Co-Conspirator (other than AgStar) have illegally limited the supply of pork, manipulated its price, injured Plaintiffs, and caused Plaintiffs damages by forcing them to pay inflated, supra-competitive prices for pork.

## XV.   **Prayer for Relief**

WHEREFORE, Plaintiffs pray for the following relief:

A.     Enter joint and several judgment against Defendants in favor of Plaintiffs;

B.     Award Plaintiffs damages against Defendants in a joint and several judgment for an amount to be determined at trial to the maximum extent allowed under the claims stated above, as well as treble damages, any other enhancement of damages, attorneys' fees, expenses, and costs as provided by law;

C.     A permanent injunction enjoining Defendants from communicating or exchanging Competitively-Sensitive Information through Agri Stats in a manner that enables each of them to know the other's Competitively-Sensitive Information, and, in the interest of protecting competition, requiring Agri Stats to take those reasonable steps necessary to make sure that a given pork producer's Competitively-Sensitive Information is not known or knowable by its competitors.

D.     Such other and further relief as the Court may deem just and proper.

## XVI.  **Jury Trial Demanded**

308.     Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 3, 2024                          Respectfully submitted,

                                              BAKER BOTTS L.L.P.

                                              _/s/ Andrew George_____
                                              Andrew George
                                              andrew.george@bakerbotts.com
                                              Michael Calhoon
                                              michael.calhoon@bakerbotts.com
                                              Christopher P. Wilson
                                              christopher.wilson@bakerbotts.com
                                              Julie B. Rubenstein
                                              julie.rubenstein@bakerbotts.com
                                              Jana Seidl
                                              jana.seidl@bakerbotts.com
                                              Kristin Barkemeyer
                                              kristin.barkemeyer@bakerbotts.com
                                              Wyatt M. Carlock
                                              wyatt.carlock@bakerbotts.com
                                              Angela Brown
                                              angela.brown@bakerbotts.com
                                              700 K Street NW
                                              Washington, DC 20001
                                              Telephone: (202) 639-7700
                                              Facsimile: (202) 639-7890

                                              Ariel D. House
                                              ariel.house@bakerbotts.com
                                              401 South 1st Street, Suite 1300
                                              Austin, TX 78704
                                              Telephone: (512) 322-2500
                                              Facsimile: (512) 322-2501